Justice Stevens
delivered the opinion of the Court.
In Dunn v. United States, 284 U. S. 390, 393 (1932), the Court, speaking through Justice Holmes, held that a logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict. The question presented in this case is whether an apparent inconsistency between a jury’s verdict of acquittal on some counts and its failure to return a verdict on other counts affects the preclusive force of the acquittals under the Double Jeopardy Clause of the Fifth Amendment. We hold that it does not.
I
In 1997, Enron Corporation (Enron) acquired a telecommunications business that it expanded and ultimately renamed Enron Broadband Services (EBS). Petitioner F. Scott Yeager served as Senior Vice President of Strategic Development for EBS from October 1, 1998, until his employment was terminated a few months before Enron filed for bankruptcy on December 2, 2001. During his tenure, petitioner *113 played an active role in EBS’s attempt to develop a nationwide fiber-optic telecommunications system called the Enron Intelligent Network (EIN).
In the summer of 1999, Enron announced that EBS would become a “‘core’” Enron business and a major part of its overall strategy. App. 11. Thereafter, Enron issued press releases touting the advanced capabilities of EIN and claiming that the project was “‘lit,’” or operational. Id., at 10. On January 20, 2000, at the company’s annual equity analyst conference, petitioner and others allegedly made false and misleading statements about the value and performance of the EIN project. On January 21, 2000, the price of Enron stock rose from $54 to $67. The next day it reached $72. At that point petitioner sold more than 100,000 shares of Enron stock that he had received as part of his compensation. During the next several months petitioner sold an additional 600,000 shares. All told, petitioner’s stock sales generated more than $54 million in proceeds and $19 million in personal profit. As for the EIN project, its value turned out to be illusory. The “intelligent” network showcased to the public in the press releases and at the analyst conference was riddled with technological problems and never fully developed.
On November 5, 2004, a grand jury returned a “Fifth Superseding Indictment” charging petitioner with 126 counts of five federal offenses: (1) conspiracy to commit securities and wire fraud; (2) securities fraud; (3) wire fraud; (4) insider trading; and (5) money laundering.[1] The Government’s theory of prosecution was that petitioner — acting in concert with other Enron executives — purposefully deceived the *114 public about the EIN project in order to inflate the value of Enron’s stock and, ultimately, to enrich himself.[2] Id., at 6.
Count 1 of the indictment described in some detail the alleged conspiracy to commit securities fraud and wire fraud and included as overt acts the substantive offenses charged in counts 2 through 6. Count 2, the securities fraud count, alleged that petitioner made false and misleading statements at the January 20, 2000, analyst conference or that he failed to state facts necessary to prevent statements made by others from being misleading. Counts 3 through 6 alleged that petitioner and others committed four acts of wire fraud when they issued four EBS-related press releases in 2000. Counts 27 through 46, the insider trading counts, alleged that petitioner made 20 separate sales of Enron stock “while in the possession of material non-public information regarding the technological capabilities, value, revenue and business performance of [EBS].” Id., at 31. And counts 67 through 165, the money laundering counts, described 99 financial transactions involving petitioner’s use of the proceeds of his sales of Enron stock, which the indictment characterized as “criminally derived property.” Id., at 37. To simplify our discussion, we shall refer to counts 1 through 6 as the “fraud counts” and the remaining counts as the “insider trading counts.”
The trial lasted 13 weeks. After four days of deliberations, the jury notified the court that it had reached agreement on some counts but had deadlocked on others. The judge then gave the jury an Allen charge, see Allen v. United States, 164 U. S. 492, 501-502 (1896), urging the jurors to reexamine the grounds for their opinions and to continue deliberations “until the end of the day” to achieve a final verdict on all counts. 56 Tr. 13724 (July 20, 2005). When the jury failed to break the deadlock, the court told *115 the jurors that it would “take their verdict” instead of prolonging deliberations. Id., at 13725. The jury acquitted petitioner on the fraud counts but failed to reach a verdict on the insider trading counts. The court entered judgment on the acquittals and declared a mistrial on the hung counts.
On November 9, 2005, the Government obtained a new indictment against petitioner. This “Eighth Superseding Indictment” recharged petitioner with some, but not all, of the insider trading counts on which the jury had previously hung. App. 188. The new indictment refined the Government’s ease: Whereas the earlier indictment had named multiple defendants, the new indictment dealt exclusively with petitioner. And instead of alleging facts implicating a broader fraudulent scheme, the new indictment focused on petitioner’s knowledge of the EIN project and his failure to disclose that information to the public before selling his Enron stock.
Petitioner moved to dismiss all counts in the new indictment on the ground that the acquittals on the fraud counts precluded the Government from retrying him on the insider trading counts.[3] He argued that the jury’s acquittals had necessarily decided that he did not possess material, nonpublic information about the performance of the EIN project and its value to Enron. In petitioner’s view, because re-prosecution for insider trading would require the Government to prove that critical fact, the issue-preclusion component of the Double Jeopardy Clause barred a second trial of that issue and mandated dismissal of all of the insider trading counts.
The District Court denied the motion. After reviewing the trial record, the court disagreed with petitioner’s reading of what the jury necessarily decided. In the court’s telling, *116 the jury likely concluded that petitioner “did not knowingly and willfully participate in the scheme to defraud described in the conspiracy, securities fraud, and wire fraud counts.” 446 F. Supp. 2d 719,735 (SD Tex. 2006). The court therefore concluded that the question whether petitioner possessed insider information was not necessarily resolved in the first trial and could be litigated anew in a second prosecution.
The Court of Appeals disagreed with the District Court’s-analysis of the record, but nevertheless affirmed. It reasoned that petitioner “did not dispute” the Government’s theory that he “helped shape the message” of the allegedly fraudulent presentations made at the analyst conference, and therefore rejected the District Court’s conclusion that the jury had “acquitted [petitioner] on the groun[d] that he did not participate in the fraud.” 521 F. 3d 367, 377 (CA5 2008). Based on its independent review of the record, the Court of Appeals instead concluded that “the jury must have found when it acquitted [petitioner] that [he] did not have any insider information that contradicted what was presented to the public.” Id., at 378. The court acknowledged that this factual determination would normally preclude the Government from retrying petitioner for insider trading or money laundering.
The court was nevertheless persuaded that a truly rational jury, having concluded that petitioner did not have any insider information, would have acquitted him on the insider trading counts. That the jury failed to acquit, and instead hung on those counts, was pivotal in the court’s issue-preclusion analysis. Considering “the hung counts along with the acquittals,” the court found it impossible “to decide with any certainty what the jury necessarily determined.” Ibid. Relying on Circuit precedent, United States v. Larkin, 605 F. 2d 1360 (1979), the court concluded that the conflict between the acquittals and the hung counts barred the application of issue preclusion in this case. 521 F. 3d, at 378-379.
*117 Several courts have taken the contrary view and have held that a jury’s failure to reach a verdict on some counts should play no role in determining the preclusive effect of an acquittal. See United States v. Ohayon, 483 F. 3d 1281 (CA11 2007); United States v. Romeo, 114 F. 3d 141 (CA9 1997); United States v. Bailin, 977 F. 2d 270 (CA7 1992); United States v. Frazier, 880 F. 2d 878 (CA6 1989). Others have sided with the Fifth Circuit. See United States v. Howe, 538 F. 3d 820 (CA8 2008); United States v. Aguilar-Aranceta, 957 F. 2d 18 (CA1 1992); United States v. White, 936 F. 2d 1326 (CADC 1991). We granted certiorari to resolve the conflict, 555 U. S. 1028 (2008), and now reverse.
II
The Double Jeopardy Clause of the Fifth Amendment provides: “[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb.”
While we have decided an exceptionally large number of cases interpreting this provision, see, e. g., United States v. DiFrancesco, 449 U. S. 117, 126-127 (1980) (collecting cases), most of our decisions have found more guidance in the common-law ancestry of the Clause than in its brief text. Thus, for example, while the risk of being fined or imprisoned implicates neither “life” nor “limb,” our early cases held that double jeopardy protection extends to punishments that are not “positively covered by the language of [the] amendment.” Ex parte Lange, 18 Wall. 163, 170 (1874). As we explained, “[i]t is very clearly the spirit of the instrument to prevent a second punishment under judicial proceedings for the same crime, so far as the common law gave that protection.” Ibid.
Our cases have recognized that the Clause embodies two vitally important interests. The first is the “deeply in-, grained” principle that “the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subject *118 ing him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.” Green v. United States, 355 U. S. 184, 187-188 (1957); see Benton v. Maryland, 395 U. S. 784, 795 (1969); DiFrancesco, 449 U. S., at 127-128. The second interest is the preservation of “the finality of judgments.” Crist v. Bretz, 437 U. S. 28, 33 (1978).
The first interest is implicated whenever the State seeks a second trial after its first attempt to obtain a conviction results in a mistrial because the jury has failed to reach a verdict. In these circumstances, however, while the defendant has an interest in avoiding multiple trials, the Clause does not prevent the Government from seeking to reprosecute. Despite the argument’s textual appeal, we have held that the second trial does not place the defendant in jeopardy “twice.” Richardson v. United States, 468 U. S. 317, 323 (1984); see 3 J. Story, Commentaries on the Constitution §1781, pp. 659-660 (1833). Instead, a jury’s inability to reach a decision is the kind of “manifest necessity” that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled. See Arizona v. Washington, 434 U. S. 497, 505-506 (1978); United States v. Perez, 9 Wheat. 579, 580 (1824). The “interest in giving the prosecution one complete opportunity to convict those who have violated its laws” justifies treating the jury’s inability to reach a verdict as a nonevent that does not bar retrial. Washington, 434 U. S., at 509.
While the case before us involves a mistrial on the insider trading counts, the question presented cannot be resolved by asking whether the Government should be given one complete opportunity to convict petitioner on those charges. Rather, the case turns on the second interest at the core of the Clause. We must determine whether the interest in preserving the finality of the jury’s judgment on the fraud counts, including the jury’s finding that petitioner did not *119 possess insider information, bars a retrial on the insider trading counts. This requires us to look beyond the Clause’s prohibition on being put in jeopardy “twice”; the jury’s acquittals unquestionably terminated petitioner’s jeopardy with respect to the issues finally decided in those counts. The proper question, under the Clause’s text, is whether it is appropriate to treat the insider trading charges as the “same offence” as the fraud charges. Our opinion in Ashe v. Swenson, 397 U. S. 436 (1970), provides the basis for our answer.
In Ashe, we squarely held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury’s acquittal in a prior trial. In that case, six poker players were robbed by a group of masked men. Ashe was charged with — and acquitted of — robbing Donald Knight, one of the six players. The State sought to retry Ashe for the robbery of another poker player only weeks after the first jury had acquitted him. The second prosecution was successful: Facing “substantially stronger” testimony from “witnesses [who] were for the most part the same,” id., at 439-440, Ashe was convicted and sentenced to a 35-year prison term. We concluded that the subsequent prosecution was constitutionally prohibited. Because the only contested issue at the first trial was whether Ashe was one of the robbers, we held that the jury’s verdict of acquittal collaterally estopped the State from trying him for robbing a different player during the same criminal episode. Id., at 446. We explained that “when an issue of ultimate fact has once been determined by a valid and final judgment” of acquittal, it “cannot again be litigated” in a second trial for a separate offense. Id., at 443.[4] To decipher what *120 a jury has necessarily decided, we held that courts should “examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.” Id., at 444 (internal quotation marks omitted). We explained that the inquiry “must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.” Ibid. (quoting Sealfon v. United States, 332 U. S. 575, 579 (1948); internal quotation marks omitted).
Unlike Ashe, the case before us today entails a trial that included multiple counts rather than a trial for a single offense. And, while Ashe involved an acquittal for that single offense, this case involves an acquittal on some counts and a mistrial declared on others. The reasoning in Ashe is nevertheless controlling because, for double jeopardy purposes, the jury’s inability to reach a verdict on the insider trading counts was a nonevent and the acquittals on the fraud counts are entitled to the same effect as Ashe’s acquittal.
As noted above, see supra, at 116, the Court of Appeals reasoned that the hung counts must be considered to determine what issues the jury decided in the first trial. Viewed in isolation, the court explained, the acquittals on the fraud charges would preclude retrial because they appeared to support petitioner’s argument that the jury decided he lacked insider information. 521 F. 3d, at 378. Viewed alongside the hung counts, however, the acquittals appeared less decisive. The problem, as. the court saw it, was that, if “the jury found that [petitioner] did not have insider information, then the jury, acting rationally, would also have ac *121 quitted [him] of the insider trading counts.” Ibid. The fact that the jury hung was a logical wrinkle that made it impossible for the court “to decide with any certainty what the jury necessarily determined.” Ibid. Because petitioner failed to show what the jury decided, id., at 380, the court refused to find the Government precluded from pursuing the hung counts in a new prosecution.
The Court of Appeals’ issue-preclusion analysis was in error. A hung count is not a “relevant” part of the “record of [the] prior proceeding.” See Ashe, 397 U. S., at 444 (internal quotation marks omitted). Because a jury speaks only through its verdict, its failure to reach a verdict cannot — by negative implication — yield a piece of information that helps put together the trial puzzle. A mistried count is therefore nothing like the other forms of record material that Ashe suggested should be part of the preclusion inquiry. Ibid.; see also Black’s Law Dictionary 1301 (8th ed. 2004) (defining “record” as the “official report of the proceedings in a case, including the filed papers, a verbatim transcript of the trial or hearing (if any), and tangible exhibits”).. Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. Even in the usual sense of “relevance,” a hung count hardly “make[s] the existence of any fact . . . more probable or less probable.” Fed. Rule Evid. 401. A host of reasons — sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few — could work alone or in tandem to cause a jury to hang.[5] To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not *122 reasoned analysis; it is guesswork.[6] Such conjecture about possible reasons for a jury’s failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return.
A contrary conclusion would require speculation into what transpired in the jury room. Courts properly avoid such explorations into the jury’s sovereign space, see United States v. Powell, 469 U. S. 57, 66 (1984); Fed. Rule Evid. 606(b), and for good reason. The jury’s deliberations are secret and not subject to outside examination. If there is to be an inquiry into what the jury decided, the “evidence should be confined to the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration.” Packet Co. v. Sickles, 5 Wall. 580, 593 (1867); see also Vaise v. Delaval, 99 Eng. Rep. 944 (K. B. 1785) (Lord Mansfield, C. J.) (refusing to rely on juror affidavits to impeach a verdict reached by a coin flip); J. Wigmore, Evidence §2349 (McNaughton rev. 1961 and Supp. 1991).
Accordingly, we hold that the consideration of hung counts has no place in the issue-preclusion analysis. Indeed, if it were relevant, the fact that petitioner has already survived one trial should be a factor cutting in favor of, rather than against, applying a double jeopardy bar. To identify what a jury necessarily determined at trial, courts should scrutinize a jury’s decisions, not its failures tó decide. A jury’s verdict of acquittal represents the community’s collective judgment regarding all the evidence and arguments presented to it. Even if the verdict is “based upon an egregiously erroneous *123 foundation,” Fong Foo v. United States, 369 U. S. 141, 143 (1962) (per curiam), its finality is unassailable. See, e. g., Washington, 434 U. S., at 503; Sanabria v. United States, 437 U. S. 54, 64 (1978). Thus, if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element.
Ill
The Government relies heavily on two of our cases, Richardson v. United States, 468 U. S. 317, and United States v. Powell, 469 U. S. 57, to argue that it is entitled to retry petitioner on the insider trading counts. Neither precedent can bear the weight the Government places on it.
In Richardson, the defendant was indicted on three counts of narcotics violations. The jury acquitted him on one count but hung on the others. Richardson moved to bar retrial on the hung counts, insisting that reprosecution would place him twice in jeopardy for the same offense. Unlike petitioner in this case, Richardson did not argue that retrial was barred because the jury’s verdict of acquittal meant that it necessarily decided an essential fact in his favor. He simply asserted that the hung counts, standing alone, shielded him from reprosecution. We disagreed and held that “the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy.” 468 U. S., at 325. “[T]he failure of the jury to reach a verdict,” we explained, “is not an event which terminates jeopardy.” Ibid. From this the Government extrapolates the altogether different principle that retrial is always permitted whenever a jury convicts on some counts and hangs on others. Brief for United States 23-24. But Richardson was not so broad. Rather, our conclusion was a rejection of the argument— similar to the one the Government urges today — that a mis *124 trial is an event of significance. In so holding, we did not open the door to using a mistried count to ignore the preclusive effect of a jury’s acquittal.
The Government next contends that an acquittal can never preclude retrial on a mistried count because it would impute irrationality to the jury in violation of the rule articulated in Powell, 469 U. S. 57. In Powell, the defendant was charged with various drug offenses. The jury acquitted Powell of the substantive drug charges but convicted her of using a telephone in “ ‘committing and in causing and facilitating’ ” those same offenses. Id., at 59-60. Powell attacked the verdicts on appeal as irrationally inconsistent and urged the reversal of her convictions. She insisted that “collateral estoppel should apply to verdicts rendered by a single jury, to preclude acceptance of a guilty verdict on a telephone facilitation count where the jury acquits the defendant of the predicate felony.” Id., at 64. We rejected this argument, reasoning that issue preclusion is “predicated on the assumption that the jury acted rationally.” Id., at 68.
Arguing that a jury that acquits on some counts while inexplicably hanging on others is not rational, the Government contends that issue preclusion is as inappropriate in this case as it was in Powell. There are two serious flaws in this line of reasoning. First, it takes Powell’s treatment of inconsistent verdicts and imports it into an entirely different context involving both verdicts and seemingly inconsistent hung counts. But the situations are quite dissimilar. In Powell, respect for the jury’s verdicts counseled giving each verdict full effect, however inconsistent. As we explained, the jury’s verdict “brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.” Id., at 67. By comparison, hung counts have never been accorded respect as a matter of law or history, and are not similar to jury verdicts in any relevant sense. By equating them, the Government’s argument fails. Second, the Government’s reliance on Powell assumes that a *125 mistried count can, in context, be evidence of irrationality. But, as we explained above, see supra, at 121-122, the fact that a jury hangs is evidence of nothing — other than, of course, that it has failed to decide anything. By relying on hung counts to question the basis of the jury’s verdicts, the Government violates the very assumption of rationality it invokes for support.
At bottom, the Government misreads our cases that have rejected attempts to question the validity of a jury’s verdict. In Powell and, before that, in Dunn, 284 U. S. 390, we were faced with jury verdicts that, on their face, were logically inconsistent and yet we refused to impugn the legitimacy of either verdict. In this case, there is merely a suggestion that the jury may have acted irrationally. And instead of resting that suggestion on a verdict, the Government relies on a hung count, the thinnest reed of all. If the Court in Powell and Dunn declined to use a clearly inconsistent verdict to second-guess the soundness of another verdict, then, a fortiori, a potentially inconsistent hung count could not command a different result.
IV
One final matter requires discussion. The Government argues that even if we conclude (as we do) that acquittals can preclude retrial on counts on which the same jury hangs, we should nevertheless affirm the judgment of the Court of Appeals because petitioner failed to show that the jury necessarily resolved in his favor an issue of ultimate fact that the Government must prove in order to convict him of insider trading and money laundering. See Brief for United States 41-45. Given the length and complexity of the proceedings, this factual dispute is understandable. The District Court and Court of Appeals each read the record differently, disagreeing as to what the jury necessarily decided in its acquittals. Compare 446 F. Supp. 2d, at 735 (“[T]he jury necessarily determined that Defendant Yeager did not know *126 ingly and willfully participate or agree to participate in a scheme to defraud in connection with the alleged false statements or material omissions made at the analyst conference and press releases”), with 521 F. 3d, at 378 (“[T]he jury must have found when it acquitted Yeager that Yeager himself did not have any insider information that contradicted what was presented to the public”). Our grant of certiorari was based on the assumption that the Court of Appeals’ interpretation of the record was correct. We recognize the Government’s right, as the prevailing party in the Court of Appeals, to “defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals.” Washington v. Confederated Bands and Tribes of Yakima Nation, 439 U. S. 463, 476, n. 20 (1979). But we decline to engage in a fact-intensive analysis of the voluminous record, an undertaking unnecessary to the resolution of the narrow legal question we granted certiorari to answer. If it chooses, the Court of Appeals may revisit its factual analysis in light of the Government’s arguments before this Court.
V
The judgment is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

It is so ordered.

 See 18 U. S. C. § 371 (conspiracy to commit fraud against the United States); 15 U. S. C. §78j(b) (1994 ed.), §78ff (2000 ed.), and 17 CFR §240.10b-5 (2004) (securities fraud); 18 U. S. C. §1343 (2000 ed.) (wire fraud); 15 U. S. C. §78j(b) (1994 ed.), §78ff (2000 ed.), and 17 CFR § 240.10b5-l (insider trading); 18 U. S. C. § 1957 (money laundering).

 While petitioner was charged with 126 counts, the indictment included 176 counts in all, covering conduct by executives purportedly involved in the alleged fraud.

 Petitioner had also moved to dismiss the relevant counts in the earlier indictment in response to the Government’s assertion that it could reprosecute petitioner for the previously hung counts under that indictment as well. See 521 F. 3d 367, 370, n. 4 (CA5 2008).

 Although the doctrine of collateral estoppel had developed in civil litigation, we had already extended it to criminal proceedings when Ashe was decided. The justification for this application was first offered by Justice Holmes, who observed that “[i]t cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are *120 less than those that protect from a liability in debt.” United States v. Oppenheimer, 242 U. S. 85, 87 (1916). Currently, the more descriptive term “issue preclusion” is often used in lieu of “collateral estoppel.” See Restatement (Second) of Judgments §27 (1980).

 Indeed, there were many indications that the jury in this case could have been exhausted after the 13-week trial. See Reply Brief for Petitioner 9-10 (cataloging numerous “statements on the record [that] reveal the very real possibility that the jurors cut their deliberations short out of exhaustion”).

 It would also require too much of the defendant. To preclude retrial, he must show that the jury necessarily decided an issue in his favor. Yet, to borrow from the Court of Appeals, “[b]ecause it is impossible to determine why [a] jury hung,” 521 F. 3d, at 379, the defendant will have to rebut all inferences about what may have motivated the jury to hang without the ability to seek conclusive proof. See Fed. Rule Evid. 606(b). There is no reason to impose such a burden on a defendant.