**FIFTH DIVISION**
**MCFADDEN, C.J.,**
**MCMILLIAN, P.J., and GOSS, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 2, 2019**

# In the Court of Appeals of Georgia

A19A0671. WARD v. THE STATE.

MCMILLIAN, Presiding Judge.

After Michael Charles Ward was acquitted of stalking, he was tried and convicted by a jury of aggravated stalking against the same victim. He appeals, pro se, following the denial of his motion for new trial, as amended, raising claims of double jeopardy, prosecutorial misconduct, a biased judiciary, ineffective assistance of counsel, a defective and improper indictment, and improper and insufficient evidence to support his conviction. As more fully set forth below, we now reverse.

Construed so as to support the jury's verdict, the record shows that Ward and the victim[1] began dating in 2005 and had an on-again, off-again relationship for the

---

[1] We set out here the evidence adduced at Ward's trial on the aggravated stalking charge, which we will refer to as "Trial 2." However, we will also note if a witness testified or the evidence was introduced at Ward's first trial on misdemeanor

next several years. During this time, Ward lived in Marietta, Georgia, and the victim lived alone in a house located in a somewhat remote area in Oconee County, and she also had a vacation home on a lake in another county. By the summer of 2007, the victim and Ward were once again having problems, and the victim told him she did not want to continue seeing him. Over the summer, Ward showed up at the victim's various residences unannounced, and on at least one occasion he brought a handgun that he told the victim he planned to use to shoot whomever he found her with.

In early August 2007, the victim told Ward not to call her anymore, but Ward came to her home while she was out of town. Later in August, the victim sent an email to Ward reiterating that their relationship was over and that he needed to come pick up his belongings, and Ward showed up at her house unannounced a few days later. The victim helped him pack up his things and then told him once again that the relationship was over. However, the victim kept receiving long emails from Ward reiterating his love for her, and he showed up at her home again in early September in hopes of a reconciliation but the victim once again told him they were through and requested he leave. And on September 6, 2007, the victim sent Ward another email with the subject line "NO MORE," in which she emphatically told him not to contact

stalking and other charges, which we will refer to as "Trial 1."

2

her in any way. Nevertheless, around September 18, 2007, Ward showed up at her house with gifts and asked her to marry him. She declined and told him to leave. However, he was waiting for her when she came home the night of October 2, 2007, and she told him he was frightening her with his behavior and asked him to leave.

During this time frame, the victim also detected signs that someone had been in her home while she was away. Because of her concerns about Ward's behavior, the victim contacted an attorney she knew in early October 2007.[2] The attorney called Ward and told him that the victim did not want to have any further contact with him and that he would be sending him a letter to that effect, which he sent shortly afterwards; this letter was read to the jury at trial. On October 22, 2007, the victim's housekeeper and teenage daughters[3] saw a man dressed in camouflage walking around the outside of the victim's Oconee County house and in the nearby woods. The housekeeper called police and showed them a picture of Ward and "suggested" it might be him. At the responding officer's suggestion, the victim made a request for a security check, which alerted officers of the need to patrol her property more

---

[2] This attorney also testified at Trial 1.

[3] The housekeeper and one of her teenage daughters also testified at Trial 1.

frequently, and which contained a specific notation that Ward was not allowed to be on the property.

After a telephone call with Ward at the end of October during which he called the victim a "whore" and was screaming at her, the victim went to the Oconee County Sheriff's office and talked to a Detective.[4] On November 2, 2007, the Detective contacted Ward and told him that he had talked to the victim and she had made it clear that she did not want any further contact with Ward of any kind whatsoever. He said that Ward told him that he had already ended all contact with the victim.

A few days later, on November 5, 2007, the victim's nephew,[5] spotted a car on property near the victim's house and noticed it was registered to the county where Ward lived at the time. The nephew called the police and then noticed Ward walking out of the woods wearing camouflage. The Detective came to the scene where he recovered a number of items from Ward's car, including a number of personal items that appeared to be taken from the victim's home, information about her friends, phone numbers taken from the caller identification on her phone, and various tools

---

[4] The Detective also testified at Trial 1.

[5] This witness was unavailable due to a medical emergency and did not testify at Trial I.

that could be used to break into her house, which Ward admitted to police he planned to use to gain access to the victim's home.[6]

Following this incident, Ward was arrested and then released on a "no-contact" bond on Tuesday, November 6, 2007. On November 20, 2007, a multi-count indictment was returned against Ward charging him with multiple counts of burglary, computer theft, theft by taking, possession of tools in the commission of a crime, and stalking. In early December 2007, Ward ordered a book called "Redeeming Love" off Amazon.com and had it delivered to the victim's house.[7] Ward was arrested for violating his no-contact bond and subsequently indicted on the felony offense of aggravated stalking on January 24, 2008.

---

[6] In addition to the evidence recited above, the jury also heard evidence that after he was arrested for aggravated stalking, Ward went to the Cobb County police and instigated an investigation against the victim for "computer invasion of privacy," accusing the victim of improperly accessing his emails. Evidence was also introduced at both trials that while he was in jail awaiting trial, Ward wrote a letter or memo, self-titled the "Giggles" Mission, setting out an elaborate plan to break into the victim's home and take some items out of the home and to otherwise wreak havoc and destruction throughout. However, this missive was sent to Ward's sons or ex-wife, and the victim did not know about it until Ward's ex-wife sent it to police in June 2008.

[7] Ward admitted at a hearing on February 8, 2008 that he sent the book to the victim and has never denied sending the book.

In August 2009, Ward was tried on the first indictment charging him with misdemeanor stalking and various other crimes. Despite the evidence of Ward's unsolicited and alarming contacts with the victim, a jury acquitted him of all charges except for possession of tools in the commission of a crime. Ward did not appeal that conviction.

Following Ward's acquittal on the misdemeanor stalking charge, the State moved to dead docket the pending aggravated stalking charge, but Ward objected and the trial court denied the State's request. In January 2010, just five months after his acquittal on the stalking and other charges, a jury convicted Ward of aggravated stalking,[8] and he was sentenced to the maximum of ten years with credit for time served. Ward filed a motion for new trial on February 3, 2010, and following several amendments and a lengthy delay, a hearing was held on the motion on September 21, 2017. The trial court denied the motion on December 14, 2017, and Ward timely filed a notice of appeal to this Court on January 8, 2018.

1. We first address the issue of the troublesome delay in this case between the time of trial and the ruling on the motion for new trial, which delayed the docketing of this appeal. As noted above, well over seven years passed between the time Ward

---

[8] Ward elected to represent himself during Trial 2.

6

filed his motion for new trial and when the trial court held the hearing on the motion[9] such that Ward's timely notice of appeal was not filed in this case until almost eight years after his conviction. Ward was in jail from the time he was re-arrested on the aggravated stalking charge, and according to his brief, he completed serving his sentence and was released from prison in February 2018.

> This sort of extraordinary post-conviction, pre-appeal delay puts at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial. It is the duty of those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay. That duty unfortunately was not fulfilled in this case.

*Robinson v. State*, 334 Ga. App. 646, 647 (1) (780 SE2d 86) (2015).

2. In several related enumerations of error, Ward argues that his prosecution on the aggravated stalking charge violated principles of double jeopardy and that the trial court should have have granted his motion in limine to exclude admission or reference to the evidence introduced during Trial 1. Specifically, he argues that because he had been acquitted of stalking in Trial 1, evidence from trial had been

_____

[9] We note that several months later the trial court promptly issued an order denying the motion.

"used up" and could not be introduced to convict him of aggravated stalking in Trial 2. He also asserts that the crimes should have been prosecuted together under OCGA §§ 16-1-7 (b) & 16-1-8 (b) (1). Under the facts of this case, we agree that reversal is required.[10]

We begin our analysis by stating our standard of review. "The appellate standard of review of a grant or denial of a double jeopardy plea in bar is whether, after reviewing the trial court's oral and written rulings as a whole, the trial court's findings support its conclusion." (Citation and punctuation omitted.) *Garrett v. State*,

---

[10] We note that Ward did not formally and in writing raise this issue until after trial. See *Alexander v. State*, 279 Ga. 683, 685 (2) (b) (620 SE2d 792) (2005) ("As a general rule, . . . failure to file a written plea in bar prior to a second trial waives the right to subsequently raise a challenge on procedural double jeopardy grounds.") (citation omitted); see also OCGA §§ 17-7-110; 17-7-111 (as a general rule, all special pleas must be in writing and made within ten days of arraignment). However, although Ward did not file a pre-trial motion asserting the bar of double jeopardy, the record shows that the trial court brought the issue to the attention of both parties on the first day of trial and the issue was repeatedly revisited throughout the proceedings. Further, the trial court recognized that whether double jeopardy was a bar in this case was dependent on what evidence the State chose to introduce at Trial 2, so that it could not make a pre-trial determination of the issue even if Ward had raised it. The trial court stated later in the proceedings that Ward's failure to raise the issue in a written motion meant that Ward was limited to raising the issue in a post-trial motion for new trial (assuming he was found guilty), and Ward did in fact raise the issue in his motion for new trial and also enumerated the failure to file a pre-trial motion as ineffectiveness on the part of his trial counsel. Thus, we will not deem the failure to file a pre-trial motion fatal to our consideration of this issue. See also *Robinson,* 334 Ga. App. at 648 (2), n.13.

8

306 Ga. App. 429, 429 (702 SE2d 470) (2010). However, "we review de novo the trial court's application of the law to undisputed facts." (Citation and punctuation omitted.) Id.

The Double Jeopardy Clause in the Fifth Amendment to the United States Constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life and limb." Likewise, the Georgia Constitution and Georgia statutory law prohibit the government from placing a defendant in jeopardy twice for the same offense following either an acquittal or a conviction and also prohibit multiple punishments for the same offense.[11]

The Supreme Court of the United States has recognized that the Double Jeopardy Clause of the federal Constitution protects two vital interests. *Yeager v. United States*, 557 U.S. 110, 117 (II) (129 SCt 2360, 174 LE2d 78) (2009). First, the State is prohibited from making repeated attempts to convict an individual for the same offense, thereby subjecting him to the ordeal and anxiety of successive prosecutions. Id. at 117-18 (II). In particular, "[t]he Double Jeopardy Clause forbids

---

[11] Ga. Const. of 1983, Art. I, Sec. I, Para. XVIII ("No person shall be put in jeopardy of life or liberty more than once for the same offense except when a new trial has been granted after conviction or in case of mistrial."); OCGA § 16-1-7 & 16-1-8 (prohibiting multiple prosecutions for the same conduct and providing when prosecution barred by former prosecution, respectively).

a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceedings. This is central to the objective of the prohibition against successive trials." *Burks v. United States*, 437 U.S. 1, 11 (98 SCt 2141, 57 LEd 2d 1) (1978). "The second interest is the preservation of the finality of judgments." (Citation and punctuation omitted.) *Yeager*, 557 U.S. at 118 (II).

Our Supreme Court has similarly recognized that under the shield of double jeopardy

> [a] defendant is protected . . . from attempts to re-litigate the facts after an acquittal and from attempts to secure additional punishment after a prior conviction and sentence. In addition to the risk of enhanced punishment for the same offense, successive prosecutions allow the State to unfairly rehearse its presentation of the evidence and hone its trial strategy, while also incrementally increasing the burden on the defendant to defend himself.

(Citations and punctuation omitted.) *Perkinson v. State*, 273 Ga. 491, 493-94 (1) (542 SE2d 91) (2001).[12]

---

[12] These principles have been reiterated in numerous cases, including the following: *Brantley v. State*, 272 Ga. 892, 893 (536 SE2d 509) (2000) ("Having failed

10

To determine if Ward was twice put in jeopardy for the "same offenses," we apply the "required evidence" or "same elements" test outlined in *Blockburger v. United States,* 284 U.S. 299 (52 SCt. 180, 76 LEd. 306) (1932), and look to whether each offense requires proof of an additional fact or element which the other does not.[13] The elements of the offense of stalking are set out in OCGA § 16-5-90: "A person commits the offense of stalking if he or she follows, places under surveillance, or contacts another person . . . without the consent of the other person for the purpose

---

to prove an element of the offense . . ., the State cannot, in effect, retry [an accused] for the same crime and thereby violate the Double Jeopardy Clause of the United States Constitution.") (citation and punctuation omitted); *Maynard v. State*, 290 Ga. App. 403, 403 (659 SE2d 831) (2008) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceedings.") (citation and punctuation omitted.); *State v. Lambert*, 276 Ga. App. 668, 669 (624 SE2d 174) (2005) ("It is axiomatic that, among other things, the Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal.") (punctuation and citation omitted); *State v. Heggs*, 252 Ga. App. 865, 865 (558 SE2d 41) (2001) ("The primary purpose of the Double Jeopardy Clause is to prohibit the retrial of a criminal defendant where, at the initial trial, the prosecution failed to introduce sufficient evidence to sustain a conviction.").

[13] In its order denying Ward's motion for new trial, the trial court stated the proper test but then concluded the State was allowed to introduce evidence of the prior stalking charge because the charge of aggravated stalking contained an additional element – the violation of a condition of pre-trial release – that the stalking charge did not, and occurred at a later time period. However, the trial court's analysis was incomplete because it did not mention or consider whether misdemeanor stalking contained an element not contained in aggravated stalking.

11

of harassing and intimidating the other person." Under OCGA § 16-5-91, "[a] person commits the offense of aggravated stalking when such person, in violation of [among other things, a condition of pretrial release] . . . places under surveillance, or contacts another person . . . without the consent of the person for the purpose of harassing and intimidating the other person." Thus, OCGA § 16-5-91 tracks the language of OCGA § 16-5-90 except that OCGA § 16-5-91 has the additional requirement that the contact be in violation of a court order. And although OCGA § 16-5-91 does not define "harassing and intimidating," our Supreme Court has explained that "the legislature has made clear that the simple stalking statute['s definition of those terms is] for purposes of the entire article on stalking in the Georgia Code." (Punctuation omitted.) *State v. Burke*, 287 Ga. 377, 378 (695 SE2d 649) (2010). Thus, for the purposes of both stalking and aggravated stalking, "harassing and intimidating" is defined as "a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, *by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose*." (Emphasis supplied) OCGA § 16-5-90 (a) (1).

12

In *Burke*, our Supreme Court made clear what the State must prove in an aggravated stalking case:

> Based on the plain terms of the stalking statutes, a single violation of a protective order, by itself, does not amount to aggravated stalking. The contact with the victim in violation of the protective order must also be without the consent of the other person for the purpose of harassing and intimidating him or her. OCGA § 16-5-91 (a). The "harassing and intimidating" conduct must be established by, among other things, "a *pattern* of harassing and intimidating behavior." A single violation of a protective order, alone, simply does not establish "a pattern of harassing and intimidating behavior."

(Citations omitted.) *Burke*, 287 Ga. at 379.

Thus, under Georgia's stalking statutes, in order to prove aggravated stalking, the State must also prove the lesser included offense of misdemeanor stalking. And for purposes of double jeopardy, a lesser-included offense and a greater offense are the same offense under the Fifth Amendment and the *Blockburger* test because the lesser crime requires no proof beyond that which is required for the conviction of the greater offense.[14]

---

[14] See *Perkinson*, 273 Ga. at 493-94 (1) ("For double jeopardy purposes, a lesser-included and a greater offense are the 'same offense' under the Fifth Amendment because the lesser offense requires no proof beyond that which is required for the conviction of the greater offense."); *Prater v. State*, 273 Ga. 477, 481

13

Although the *Blockburger* test focuses on the proof necessary to establish the statutory elements of each offense, rather than on the actual evidence to be presented at trial, we must also determine whether the State relied on the same offense as a matter of fact to prove the underlying stalking course of conduct in Trial 2 as it did in Trial 1. This is because the State is precluded under the Double Jeopardy Clause "from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Roesser v. State*, 294 Ga. 295, 296-97 (751 SE2d 297) (2013).

> To determine what a jury has necessarily decided, a court should examine the record of a prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

Id. at 297.[15]

_____

(4) (545 SE2d 864) (2001) (same); *Garrett*, 306 Ga. App at 431 (proof that defendant was guilty of DUI is a required element for convicting him of serious injury by vehicle and while the serious charges required proof of an additional fact, the DUI charge contained no additional element and thus defendant's subsequent indictment for serious injury by vehicle violated the Double Jeopardy Clause).

[15] See also *Robinson v. State*, 334 Ga. App. at 651 (double jeopardy precluded second armed robbery trial when the State sought to use the same party to the crime theory jury had rejected in the first trial); *Sandner v. State*, 193 Ga. App. 62, 63 (1) (387 SE2d 27) (1989) ("In order to sustain a plea of former jeopardy, it is always

Here, a comparison of the transcripts for both trials shows, with a few exceptions, the State relied on almost the exact same evidence to prove Ward's alleged harassing and intimidating course of conduct at both the stalking and aggravated stalking trials and the bulk of the evidence presented at Trial 2 concerned events that occurred during the range of dates stated in Ward's first indictment for stalking. Thus, except for the additional evidence concerning violation of the no-contact order and an encounter with the victim's family that occurred after he was arrested the first time, Ward was prosecuted twice for the same stalking conduct – conduct which the jury in Trial 1 had rejected as insufficient to prove the exact same offense as the State was required to prove in Trial 2, except that the State was able to improve its evidence in several respects in Trial 2.[16] This is precisely the kind of

_____

incumbent upon the defendant to plead and prove that the transaction charged in the second indictment or accusation is the same *as a matter of fact* as that charged in the first indictment or accusation under which he was put in jeopardy.") (citation and punctuation omitted).

[16] During Trial 2, the housekeeper testified on direct examination about her suspicions that the man she saw on the premises might be Ward and that she gave police a photograph of Ward based on her suspicions but that testimony was not elicited during Trial 1 because, as the prosecuting attorney explained at Trial 1, he did not believe the housekeeper could identify Ward as the person in the yard. Further, the victim's nephew who encountered Ward in the woods on November 5, 2007, which was the incident that ultimately led to Ward's arrest, was unavailable to testify at Trial 1 due to a medical emergency but testified at Trial 2.

15

rehearsal and honing of evidence that the Double Jeopardy Clause is designed to prevent. *Tanks v. State*, 292 Ga. App. 177, 179 (663 SE2d 812) (2008) (prosecution for aggravated stalking which was predicated on the same act as a prior contempt proceeding was subject to double jeopardy clause).[17]

Citing *Daker v. State*, 248 Ga. App. 657, 660 (548 SE2d 354) (2001), the State argues that the fact that the same evidence had been presented in a previous stalking trial does not present a double jeopardy issue in a stalking case. As we explained in *Daker*,

 it would be impossible for the State to prosecute repeat offenders of the stalking statute, as having once used the evidence to demonstrate a course of conduct, the State would be forever barred from using that evidence again in establishing a subsequent stalking violation. As stalking is, by its very nature, a cumulative crime, [this] interpretation of double jeopardy would eviscerate the purpose of the stalking statute, leaving would-be stalkers free to begin stalking their victim with a clean slate following a stalking conviction.

---

[17] See also *Kinney v. State*, 223 Ga. App. 418, 420 (1) (477 SE2d 843) (1996) (prosecution of the defendant for aggravated stalking based on acts asserted in a prior trial to prove violation of court order where he was adjudicated not guilty barred by double jeopardy); see also *Keener v. State*, 238 Ga. 7, 8 (230 SE2d 846) (1976) ("[W]hen crimes are to be prosecuted separately the more serious crimes should be prosecuted first to avoid the conviction of a lesser crime barring a subsequent prosecution for a more serious crime.").

16

*Daker*, 248 Ga. App. at 660. However, *Daker* is distinguishable. Unlike the present case, *Daker* involved separate and entirely distinct incidents of stalking that occurred at different times, in different counties, and involved distinct activities. Further, and perhaps more importantly, *Daker* did not involve *an acquittal* and then the introduction of the same evidence previously found lacking to prove the same elements of the same crime in another trial. Having failed to put forth sufficient evidence of the lesser included offense at Trial 1, the State cannot then use those same facts to attempt to prove the same elements as part of the greater offense at Trial 2 because a jury has already deemed those same facts insufficient to establish the elements of the lesser offense.[18] *Roesser*, 295 Ga. at 299 (double jeopardy necessarily barred later prosecution for voluntary manslaughter when the jury had necessarily determined that accused acted in self-defense by acquitting him of earlier charges of malice murder, felony murder and aggravated assault); *Robinson v. State*, 334 Ga.

---

[18] It is important to emphasize that had Ward been *convicted* of stalking in Trial 1, evidence of his conviction for that offense could have been introduced during Trial 2. Further, our opinion here does not address whether evidence from Trial 1 could have been introduced as what was at that time referred to as similar transaction evidence because that is not the posture of this case. We note, however, that the fact of acquittal does not necessarily foreclose the introduction of evidence under either our former similar transaction statute or under OCGA § 24-4-404 (b). *State v. Atkins*, 304 Ga. 413, 418-19 (2) (b) (819 SE2d 28) (2018).

App. at 651-52 (the jury having necessarily determined that defendant was not a party in the first trial, he could not be retried under the same theory in a subsequent trial).

The dissent disagrees that there was a double jeopardy violation because several witnesses testified at Trial 2 that did not testify at Trial 1, the date range of the indictments was different, and "there was additional evidence showing Ward's pattern of threatening and harassing behavior since the events charged in Trial 1 was shown at Trial 2." We agree that if the State had limited its presentation of the evidence to events since Trial 1, the evidence would have been sufficient to sustain the aggravated stalking charge. But the State chose to also present the same evidence from Trial 1, with some enhancements, and that evidence constituted the bulk of the evidence in Trial 2. The State's theory for presenting the evidence from Trial 1 was that they constituted "prior difficulties" for the purpose of illustrating "the state of feeling between the defendant and the alleged victim and the bent of mind and *course of conduct* on part of the defendant," and that's how the trial court charged the jury. The State then argued, and the jury was charged, that to find aggravated stalking, they had to find that Ward contacted the victim without her consent "for the purpose of harassing and intimidating such other person" and that "harassing and intimidating"

18

meant "a knowing and willful *course of conduct* directed at a specific person" that causes them emotional distress.

It is, thus, clear that the State was relitigating the stalking charge that was necessarily decided adversely by the jury's acquittal and that under the State's theory of the case, as supported by the trial court's instructions, the jury in Trial 2 was urged to find that the "prior difficulties" evidence proved the "harassing and intimidating" course of conduct required for the aggravated stalking charge. That the State cannot do without running afoul of the Double Jeopardy clause. Accordingly, Ward's conviction must be reversed.

3. Based on the foregoing, it is unnecessary for us to consider Ward's remaining enumerations of error as he cannot be retried.

*Judgment reversed. McFadden, C. J.,concurs and Goss, J., dissents.*\*

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. SEE COURT OF APPEALS RULE 33.2 (a).**

A19A0671. WARD v. THE STATE.

Goss, Judge, dissenting.

I dissent because I disagree that the verdict in the 2007 indictment case ("Trial 1") barred the trial conviction for aggravated stalking in the 2008 indictment case ("Trial 2") based on the principles of double jeopardy and OCGA §§ 16-1- 7 (b) and 16-1-8 (b) (1). These cases, while intertwined from the standpoint of the parties and their relationship history, involve separate acts occurring on different dates with additional evidence and witnesses presented in Trial 2 that were not part of Trial 1.

The eleven-count 2007 indictment for Trial 1 alleged events occurring between September 1, 2007, and the date of Ward's arrest on November 5, 2007. The end date of the allegations in the 2007 indictment and Trial 1 coincided with Ward being detained at gunpoint by the victim's adult nephew, Tony Lucas, until law enforcement arrived in response to his 911 call. At Trial 2, Lucas testified[1] that he found Ward's car parked out of place near his aunt's home. He blocked Ward's car with his own car, called 911, and then saw Ward, dressed in full camouflage, exiting the woods

---

[1] Although Lucas testified at Trial 2, he was unavailable to testify during Trial 1 for medical reasons.

near the victim's home despite having been told not to return.[2] Ward was carrying a book bag over his shoulder. Once law enforcement arrived, they discovered that Ward was in possession of pry bars. Although Ward was acquitted in Trial 1 of ten counts spanning events between September 1, 2007, and November 5, 2007, he was convicted of Count 9, possession of tools for the commission of a crime (OCGA § 16-7-20). Count 9 of the 2007 indictment charged Ward with having pry bars in his possession "with the intent to make use thereof in the commission of said crime by prying open a residence of [the victim]" on November 5, 2007. On August 13, 2009, Ward was sentenced to five years on probation with conditions. Ward did not appeal the verdict.

The 2008 indictment and Trial 2 were for an aggravated stalking charge arising from an event that took place after the November 5, 2007 arrest date in Trial 1. After Ward's arrest on November 5, 2007, the magistrate judge filed a bond order which contained specific, written conditions requiring Ward to "[h]ave no contact of a harassing, intimidating, threatening, provoking or violent nature, nor of any sort with the victim, with third parties regarding victim or any member of victim's household,

---

[2] This included being told by the victim verbally and in writing, by her lawyer and by local law enforcement.

or family, or with any witnesses in this case." At Trial 2, the magistrate judge testified[3] that when he entered the bond order with the no-contact provisions on November 6, 2007, he did so in court in the presence of Ward. The magistrate judge testified that he explained the order to Ward, that he handed Ward a written copy of the order, and that Ward signed the order in acknowledgment. Additionally, the magistrate judge scheduled a bond conditions review hearing, which was held on November 9, 2007.

After conferring with the District Attorney's Victim's Advocate Office, the victim elected not to go into the courtroom for the November 9, 2007, hearing. However, Michele Dickens, the District Attorney's Victim's Advocate, testified at Trial 2[4] that she attended the hearing along with the victims' family members. Dickens testified that, after the bond hearing, Ward followed the victim's family out of the courtroom through the courthouse, trying to talk to them, which upset the family members. Dickens had to tell Ward that he needed to leave. The provisions in the no-contact bond order applied to the victim's family members as well.

---

[3] The magistrate judge did not testify in Trial 1.

[4] Dickens did not testify at Trial 1.

3

The central event giving rise to the 2008 aggravated stalking indictment tried in Trial 2 was Ward's act of shipping the book *Redeeming Love* to the victim via online purchase received on December 3, 2007. This was in violation of the no-contact provisions of his bond order entered nearly a month earlier. Further, there was additional evidence showing Ward's pattern of threatening and harassing behavior since the events charged in Trial 1 was shown at Trial 2. Dickens, Lucas and the magistrate judge testified at Trial 2, but did not testify at Trial 1. Additionally, Tony Self, an inmate at the county jail, testified only at Trial 2. He testified that Ward offered him money to fabricate testimony against the victim.

Unlike the fact pattern in *State v. Burke*, 287 Ga. 377 (695 SE2d 649) (2010), the evidence of Ward's violation of the no-contact bond order on December 3, 2007, was not a single event. Although the jury in Trial 1 acquitted Ward of stalking for events occurring between the dates of September 1, 2007, and November 5, 2007, the jury in Trial 1 did convict Ward of being in possession of tools for the commission of a crime, notably pry bars, with the intent to gain entry into the victim's house. This was evidence, along with the testimony of the magistrate judge, Dickens, Lucas and Self, that was presented during Trial 2, but not during Trial 1, that allowed the jury to return a guilty verdict for the aggravated stalking occurring a month after the

4

events outlined in the 2007 indictment and Trial 1. The jury in Trial 2 was presented evidence from which it could find the "harassing and intimidating" behavior required by OCGA § 16-5-91 (a) that consisted of more than the single event of shipping the book received on December 3, 2007.

Similarly to *Daker v. State*, 248 Ga. App. 657 (548 SE2d 354) (2001), the aggravated stalking charge of the 2008 indictment and Trial 2 was based on a different event occurring at a different time from the events outlined in the 2007 indictment and Trial 1. As noted in *Daker*, "[i]f we were to accept [Ward's] argument, then it would be impossible for the State to prosecute repeat offenders of the stalking statute as, having once used the evidence to demonstrate a course of conduct, the State would be forever barred from using that evidence again in establishing a subsequent stalking violation. . . . [S]talking is, by its very nature, a cumulative crime[.]" Id. at 660 (2). Here, the 2008 indictment and Trial 2, while linking back to evidence of the sequence of events leading up to Ward's November 5, 2007, arrest, focused on his actions subsequent to being released on a no-contact bond order on November 6, 2007. Because there is no violation of double jeopardy principles, I dissent.