# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Shawn Reaves, Petitioner.

Appellate Case No. 2014-000813

_____

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

_____

Appeal from Marion County
William H. Seals, Jr., Circuit Court Judge

_____

Opinion No. 27569
Heard May 6, 2015 – Filed September 2, 2015

_____

## AFFIRMED

_____

Appellate Defender LaNelle C. DuRant, of Columbia, for Petitioner.

Attorney General Alan M. Wilson and Assistant Attorney General Mark R. Farthing, both of Columbia, for Respondent.

_____

**JUSTICE HEARN:** Shawn Reaves was convicted of voluntary manslaughter after the shooting death of Keshawn Applewhite. He now argues

that deficiencies in the police investigation—including the loss of potentially exculpatory evidence and the failure to ascertain the identity of a second shooter—deprived him of a fair trial, and delays occasioned by the State's faulty investigation deprived him of the right to a speedy trial.  Reaves asks the indictment be dismissed.  We disagree and therefore affirm.

## FACTUAL/PROCEDURAL HISTORY

Police responded to a call about a fight in progress in Marion.  On their way to the scene, the officers were notified that shots had been fired.  When they arrived, officers found Applewhite slumped inside the rear passenger seat of a white Crown Victoria with apparent gunshot wounds.  Applewhite was transported to the hospital, but later died as a result of his injuries.

An autopsy revealed that Applewhite had been shot five times.  Three of the bullets passed through his body.  Another bullet entered and remained lodged in Applewhite's shoulder.  The fifth bullet, which was determined to be the fatal one, entered Applewhite's upper back, struck his lung, aorta, and liver, and ultimately stopped in his colon.  A South Carolina Law Enforcement Division (SLED) analyst determined the fatal bullet was a .38 or .357 caliber likely fired from a revolver, and the shot lodged in his shoulder was a 9mm caliber likely fired from a semiautomatic pistol.  Accordingly, the analyst concluded the two shots were fired from different guns.

As the police investigation progressed, witnesses identified sixteen-year-old Reaves as one of the shooters.  Police obtained a warrant for Reaves' arrest, and he was apprehended in Philadelphia in May of 2007, where he had fled after the shooting.  Reaves was transported back to South Carolina and charged with murder and assault and battery with intent to kill.  After more than three years had passed while incarcerated, Reaves made a speedy trial motion in August of 2010.  Reaves' case was called for trial later that same month.

During the first day of Reaves' trial, an eyewitness to the shooting, Jackie McGill, and multiple police officers testified.  After the jury was excused for the day, defense counsel had the opportunity to review a number of documents in the investigator's file which were previously unknown to either party.  Among these documents was a signed statement from a hearsay witness saying that Jeremy Vereen, not Reaves, was the shooter who fired the fatal bullet.  Also among the

materials was a handwritten note from the lead investigator in the case indicating that Vereen may have been the second shooter. Reaves moved for a mistrial based on the possible exculpatory value the documents presented, and because he had not been provided them pursuant to his request for disclosure under Rule 5, SCRCrimP. The State agreed a mistrial was appropriate. The trial judge granted a mistrial.

Prior to his second trial, Reaves moved for dismissal of the indictment on due process grounds. Reaves also made a motion to dismiss the case because his right to a speedy trial had been violated. Both motions were denied.

At the second trial, McGill again testified about the shooting. McGill stated he and Applewhite, along with Applewhite's cousin, Karen Graves, and McGill's friend, Travis Lane, drove together to see Applewhite's former girlfriend, Joemilla Wilson. Applewhite and Wilson had been living together in Atlanta as recently as a month before the shooting. However, Wilson was then at the house of her new boyfriend, Deshawn Bellamy.

According to McGill, Applewhite called Wilson out of the house to talk and the two started walking down the street, arguing. They soon started fist-fighting, and Applewhite threw Wilson to the ground. After McGill broke up the fight and put Applewhite back in the car, Wilson came over and spit on Applewhite through an open window. Applewhite then got back out of the car and chased after Wilson, who retreated to the porch of the house. Applewhite followed, but was intercepted by Reaves, who met him at the bottom of the porch steps. It was at this point that Reaves shot Applewhite.

McGill's testimony was corroborated by Wilson, who stated she saw Reaves fire a revolver at Applewhite. Additionally, the initial lead investigator in the case, Captain Jim Gray, testified to his investigation of the shooting and the second lead investigator, Lieutenant Farmer Blue, who took over after Captain Gray became ill, testified about his identification of Reaves as the shooter. This was Lt. Blue's first murder investigation, and he conceded "there would have been a lot of other things I would have done different (sic) in the case."

Over the course of the trial, it became clear there were serious problems with the investigation into Applewhite's death. The crime scene had not been properly sealed, and the crime scene log of people entering and exiting the area was not

accurately maintained.[1]  A number of pieces of physical evidence—including two hats, a credit card bearing the name of William A. Bellamy, three cell phones, and a Bluetooth headset—were collected at the scene but not tested.  Three gold chains, which Wilson testified were snatched off Reaves' neck by Applewhite moments before the shooting, were collected at the scene but were missing at the time of trial.  Further, Applewhite's clothing, which was collected by police from the hospital, was also lost or destroyed.  Additionally, five witness statements, written by McGill, Lane, Graves, and two other people, were purportedly taken by police officers at the scene that night but were unaccounted for at trial.

The problems with the investigation coincided with three main discrepancies in the facts of the case.  First, although there was information Vereen was involved in Applewhite's death, the second shooter had not been definitively identified at the time of trial.[2]  Second, both McGill and Lane were shown a photo lineup with Reaves in it, and despite testifying they had known Reaves for years, they both selected another person named "BT" as the shooter.  Third, the inconsistency between expert testimony that the fatal shot was to Applewhite's upper back and witness testimony placing Applewhite in front of Reaves during the shooting was never explained.

Reaves renewed his motions to dismiss regarding his right to a fair trial and right to a speedy trial after the State's case and again at the close of all the evidence.  Although the trial court expressed concern over the investigation of the shooting, it denied both motions.[3]

Reaves was ultimately convicted of voluntary manslaughter.  He was sentenced to twenty-five years' imprisonment.  Reaves appealed his conviction and sentence, claiming he was deprived of the right to a fair trial as a result of the lost

---

[1] Marion's longtime mayor, Bobby Gerald, was walking around the scene after the shooting for unknown reasons, although it was determined he was *not* investigating the shooting.

[2] Lt. Blue testified that although he had information that Vereen was the second shooter, he had not talked to Vereen regarding the shooting in the three-and-a-half years or so between the incident and trial.

[3] At one point, the same trial judge, who had earlier granted Reaves' motion for a mistrial, stated: "obviously we've got a messed up trial based on that bad investigation."

evidence as well as his right to a speedy trial. The court of appeals affirmed in an unpublished opinion. *State v. Reaves*, Op. No. 2014-UP-057 (S.C. Ct. App. filed February 12, 2014). Reaves filed a petition for certiorari, which this Court granted.

## ISSUES PRESENTED

I.      Did the court of appeals err in affirming the trial court's denial of Reaves' motion to dismiss the indictment because his right to a fair trial had been violated?

II.      Did the court of appeals err in affirming the trial court's denial of Reaves' motion to dismiss the case because his right to a speedy trial had been violated?

## LAW/ANALYSIS

## I.      FAIR TRIAL

Reaves argues the court of appeals erred in affirming the trial judge's denial of his motion to dismiss the indictment because the evidence lost by police in the investigation of his case effectively deprived him of a fair trial. We disagree.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees a defendant's fundamental right to a fair trial. U.S. Const. amend XIV. Where a defendant's right to a fair trial due to missing or destroyed evidence is at issue, the applicable standard is derived from the United States Supreme Court's opinion in *Arizona v. Youngblood*, 488 U.S. 51 (1988).

In *Youngblood*, a ten-year-old boy was abducted and brutally sodomized by a middle-aged man. *Id.* at 52. The police obtained a sexual assault kit from the hospital as well as the boy's underwear and shirt. *Id.* at 52–53. However, police did not timely examine the assault kit or refrigerate the boy's clothing; as a result, later tests on the kit and clothing were inconclusive as to the identity of the assailant. *Id.* at 53–54. Nevertheless, the State proceeded to trial based primarily on the boy's photo lineup identification of Larry Youngblood as his attacker. *Id.* at 53. Youngblood's primary defense was that the boy misidentified him as the perpetrator, but he was nevertheless convicted of child molestation, sexual assault, and kidnapping. *Id.* at 53–54. The Arizona Court of Appeals reversed Youngblood's conviction reasoning that the timely performance of tests with properly preserved semen samples may have produced results which could have exonerated him. *Id.* at 54–55.

Examining the question of whether Youngblood's right to a fair trial had been violated, the United States Supreme Court acknowledged that "'[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.'" *Id.* at 57–58 (quoting *California v. Trombetta*, 467 U.S. 479, 486 (1984)). Rejecting an approach which would impose on the State an absolute duty to retain and preserve all potentially exculpatory evidence, the Court instead crafted a standard which focused on police conduct where evidence was lost or destroyed:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.* at 58. Finding no bad faith present in the police's failure to refrigerate the clothing and perform tests on the semen samples, the Court reversed the Arizona Court of Appeal's dismissal of the case. *Id.* at 58–59.[4]

---

[4] The Supreme Court in *Youngblood* was divided. Justice Stevens concurred in the result because although he agreed the defendant's right to a fair trial was not violated, he concluded "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Id.* at 61 (Stevens, J. concurring). Justice Blackmun wrote for three dissenters, noting "the Constitution requires that criminal defendants be provided with a fair trial, not merely a 'good faith' try at a fair trial," and further that "[r]egardless of intent or lack thereof, police action that results in a defendant's receiving an unfair trial constitutes a deprivation of due process." *Id.* at 61, 62 (Blackmun, J. dissenting). The Supreme Court recently reiterated the *Youngblood* standard in *Illinois v. Fisher*, 540 U.S. 544 (2004).

A number of state courts have declined to follow the bad faith standard established in *Youngblood* based on state law grounds. *See, e.g.*, *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999) ("Because we deem the preservation of the defendant's fundamental right to a fair trial to be a paramount consideration here, we join today those jurisdictions which have rejected the *Youngblood* analysis in its pure form."); *State v. Osakalumi*, 461 S.E.2d 504, 512 (W. Va. 1995) ("As a matter of state constitutional law, we find that fundamental fairness requires this Court to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record."); *Commonwealth v. Henderson*, 582 N.E.2d 496, 497 (Mass. 1991) ("The rule under the due process provisions of the Massachusetts Constitution is stricter than that stated in the *Youngblood* opinion."). However, Reaves does not ask this Court to do so here; his argument rests solely on the Fourteenth Amendment to the United States Constitution.

Specifically, Reaves argues the police's actions in failing to preserve evidence were so egregious as to constitute misconduct and bad faith. While he does not argue the police acted intentionally, he asserts the police's negligent and reckless conduct amounted to bad faith. However, Reaves cites no authority to support this proposition, and we found only a single federal district court case which has adopted this approach. *See United States v. Elliott*, 83 F. Supp. 2d 637, 647–48 (E.D. Va. 1999) ("[W]here the law enforcement officer acted in a manner which was either contrary to applicable policies and the common sense assessments of evidence reasonably to be expected of law enforcement officers or was so unmindful of both as to constitute the reckless disregard of both, there is a showing of objective bad faith sufficient to establish the bad faith requirement of the *Trombetta/Youngblood* test."). The weight of federal authority seems to reject

---

Ironically, Youngblood was later exonerated by DNA evidence. *See* Norman C. Bay, *Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 276 (2008). After his parole and rearrest for failing to register as a sex offender, Youngblood's attorney requested that police test a rectal swab taken from the victim with new, more sophisticated technology. *Id.* Once conducted, the DNA profile did not match Youngblood; instead, it showed that Walter Calvin Cruise, who had two prior child sex abuse convictions in Texas, committed the assault. *Id.* at 277. Youngblood was released from prison and his conviction was vacated. *Id.* at 276.

this premise and has adopted the view that the extraordinary remedy of dismissal should only be granted when the authorities act intentionally and in bad faith. *See, e.g.*, *United States v. Tyerman*, 701 F.3d 552, 560 (8th Cir. 2012) ("[The defendant] argues that a reckless destruction equates to bad faith. This court rejects that argument."); *United States v. Vera*, 61 Fed. Appx. 330, 331 (9th Cir. 2003) ("An officer does not act in bad faith unless he or she acts with the purpose of depriving the defendant of the potentially exculpatory evidence. Although the property officer may have acted negligently or even recklessly in destroying the chemical samples, there is no evidence that the officer acted in bad faith by deliberately destroying the evidence to deprive [the defendant] of access to relevant evidence." (internal citations omitted)).

Even if we were to accept the theoretical premise of Reaves' argument—that recklessness can equate to bad faith—we disagree the police were reckless in not preserving evidence in this case. Although the record is replete with indications the police investigation was deeply flawed, the record also contains no indication these flaws were the product of more than mere negligence. *See State v. Cheeseboro*, 346 S.C. 526, 539, 552 S.E.2d 300, 307 (2001) (declining to dismiss the indictment where police department negligently destroyed gun used to commit murder before the defendant was given the opportunity to run tests on it).

Further, to the extent Reaves was disadvantaged by the State's loss of evidence, Reaves' attorney was allowed to forcefully cross-examine the police officers on the deficiencies in their investigation. Additionally, the trial court instructed the jury "[w]hen evidence is lost or destroyed by a party you may infer that the evidence which was lost or destroyed by that party would have been adverse to that party."[5]

_____

[5] Although we note a similar jury charge was issued by the trial court in *Youngblood*, the propriety of this charge under state evidence law is not before the Court. Heretofore, an adverse inference charge based on missing evidence, sometimes referred to as a spoliation of evidence charge, has been limited to civil cases in South Carolina. *See Stokes v. Spartanburg Reg'l Med. Ctr.*, 368 S.C. 515, 522, 629 S.E.2d 675, 679 (Ct. App. 2006) (holding spoliation instruction was warranted in medical malpractice action where two pieces of evidence initially collected by hospital were missing); Kevin R. Eberle, *Spoliation in South Carolina*, 19 S.C. Law. 26 (2007) ("The courts of South Carolina have long recognized that a party is entitled to favorable presumptions [in civil cases] about

Accordingly, although we acknowledge there are deeply troubling aspects of the investigation in this case, the errors made by the police do not indicate bad faith as is required to dismiss an indictment under the federal constitutional test. Therefore, we affirm the court of appeals' decision to affirm the trial judge's denial of Reaves' motion to dismiss.

## II.  SPEEDY TRIAL

Reaves argues the court of appeals erred by affirming the trial judge's denial of his motion to dismiss the indictment because his right to a speedy trial had been violated.  We disagree.

A defendant's right to a speedy trial is derived from the Sixth Amendment to the United States Constitution which states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend VI. The United States Supreme Court has deemed this right as different from any other right enumerated in the Constitution for the protection of the accused due to the reality that "[d]elay is not an uncommon defense tactic" and "deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." *Barker v. Wingo*, 407 U.S. 514, 521 (1972)).

The United States Supreme Court has identified four factors to consider in determining whether a criminal defendant's right to a speedy trial has been violated: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant.  *Barker*, 407 U.S. at 530. "[T]he determination that a defendant has been deprived of this right is not based on the passage of a specific period of time, but instead is analyzed in terms of the circumstances of each case, balancing the conduct of the prosecution and the defense." *State v. Pittman*, 373 S.C. 527, 549, 647 S.E.2d 144, 155 (2008) (citing *Barker*, 407 U.S. at 530).

The length of the delay serves as a trigger mechanism for the analysis of the other three factors.  *Barker*, 407 U.S. at 530.  The delay begins to be measured when a defendant is indicted, arrested, or otherwise accused.  *State v. Langford*,

the contents of missing evidence when an opponent is responsible for the destruction of evidence that might otherwise be expected to have been relevant.").

400 S.C. 421, 442, 735 S.E.2d 471, 482 (2012) (citing *United States v. MacDonald*, 456 U.S. 1, 6 (1982)). Until there is some delay which is presumptively prejudicial to the defendant, there is no necessity to examine the other factors. *Barker*, 407 U.S. at 530. However, there is no length of delay which is per se unconstitutional; the right to a speedy trial may be violated where the delay is arbitrary or unreasonable. *Pittman*, 373 S.C. at 549, 647 S.E.2d at 155.

Closely related to the length of the delay is the reason the State advances to justify the delay. *Barker*, 407 U.S. at 531. A deliberate effort by the State to delay the trial to injure the defense should be weighted heavily against it. *Id.* Neutral reasons, such as overcrowded dockets or negligence, should be weighted less heavily; however, the State is still ultimately responsible for bringing a criminal defendant to trial. *Langford*, 400 S.C. at 443, 735 S.E.2d at 483 (citing *Pittman*, 373 S.C. at 549, 647 S.E.2d at 155). Delays caused by the defendant should weigh against him. *Langford*, 400 S.C. at 443, 735 S.E.2d at 483.

The third factor—assertion of the right—recognizes that while a criminal defendant has no responsibility to bring himself to trial, the extent to which he exercises his right to a speedy trial is significant. *Barker*, 407 U.S. at 527–28. This consideration prevents a criminal defendant from strategically acquiescing in a delay which works to his advantage, then asking the case be dismissed at the last moment once it is called for trial. Accordingly, "the defendant's failure to assert the right, although not conclusive, makes it more difficult to show that the right was violated." *Pittman*, 373 S.C. at 550, 647 S.E.2d at 155.

The final factor—prejudice to the defendant—requires a reviewing court to analyze the three different types of prejudice the speedy trial right seeks to prevent: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility the defense will be impaired. *Barker*, 407 U.S. at 532. The most serious of these interests is the last one because the inability of the defense to prepare its case—due to the death or disappearance of a witness, for example— cuts to the heart of the fairness inherent in the system. *Id.*

Reaves' speedy trial clock began to run when he was apprehended in May of 2007 and ran at least until his first trial in August of 2010, nearly thirty-nine months later. This length of time is presumptively prejudicial and triggers the remaining *Barker* inquiry. *See Pittman*, 373 S.C. at 551, 647 S.E.2d at 156 (finding delay of three years and two months was sufficient to trigger analysis of

other factors); *State v. Waites*, 270 S.C. 104, 108, 240 S.E.2d 651, 653 (1978) (holding delay of two years and four months lengthy enough to warrant review of other factors).

The State asserts that the lengthy delay was due to a heavy backlog of cases in Marion County and the complexities involved in the investigation of the case. However, neither of these are compelling reasons, especially in light of how little had been done by the police to investigate the identity of a possible second shooter. Accordingly, this factor weighs against the State. *See State v. Brazell*, 325 S.C. 65, 76, 480 S.E.2d 64, 70 (1997) (finding the State could not justify three year and five month delay where it claimed complexities in the case and upheaval in the solicitor's office caused the delay).

Turning to the third factor, Reaves did not assert his right to a speedy trial until over three years after his arrest. Significantly, his case was called for trial later that same month; the additional three-month delay was due to the trial judge's granting of Reaves' motion for a mistrial. Therefore, while we refuse to hold Reaves waived his right to a fair trial by acquiescing in the lengthy delay, his failure to assert his right to a speedy trial weighs strongly against him. *See id.* at 76, 480 S.E.2d at 71 (finding no speedy trial violation where trial was set for two months after defendant first moved for a speedy trial).

Finally, although we are cautious to not diminish the injurious effect of his lengthy incarceration prior to trial, we find Reaves has not shown the delay caused any particularized prejudice to his defense. He argues that the evidence missing in this case was lost by police during the delay, thus hampering the preparation of his defense. However, the record does not support this assertion. While it is not clear precisely when most of the evidence was lost, it is most likely that it happened shortly after Lt. Blue took over from Captain Gray as lead investigator, which was only two days after the shooting.

Further, there is no indication the lost evidence would have helped Reaves' case rather than hurt it; therefore, even assuming the evidence *was* lost during the delay, the record does not show how this would have been prejudicial to Reaves' defense. *See State v. Foster*, 260 S.C. 511, 515, 197 S.E.2d 280, 282 (1973) (finding no speedy trial violation after seven-year delay in bringing defendants to trial where the record was void of even minimal prejudice). Moreover, there is no question that Reaves was able to use the State's bungled investigation to his

advantage by subjecting the police's actions to the crucible of cross-examination and by securing the spoliation of evidence charge at trial.

While this is an extremely close case, a trial court's decision as to whether to dismiss an indictment based on speedy trial grounds is reviewed for an abuse of discretion. *Langford*, 400 S.C. at 442, 735 S.E.2d at 482. Despite our disappointment in the manner in which the criminal justice system operated in this case, we cannot say the able trial judge abused his discretion in denying Reaves' request to dismiss the case based on the violation of his right to a speedy trial. Although there was a significant delay between Reaves' arrest and his convictions and the State puts forth no compelling reason for the delay, Reaves cannot show he timely asserted his right to a speedy trial—or that his assertion when made was ignored—and cannot show that he suffered particularized prejudice as the result of the delay.

Nonetheless, we express our deep concern with a system which kept a sixteen-year-old offender in pretrial incarceration for over three years. This is precisely the type of prosecutorial discretion we sought to limit in our decision of *Langford*, which came too late to assist Reaves in timely being brought to trial. We fully expect that *Langford* will now prevent similar dilatory practices, and note that once this case was brought to the attention of the trial court through a speedy trial motion, it was expeditiously brought to trial.

## CONCLUSION

For the foregoing reasons, we hold the court of appeals did not err in affirming the trial judge's denial of Reaves' motions to dismiss the indictment regarding his right to a fair trial or his right to a speedy trial. Accordingly, we affirm.

**TOAL, C.J., BEATTY and KITTREDGE, JJ., concur. PLEICONES, J., concurring in a separate opinion.**

**JUSTICE PLEICONES:**  I concur with the majority's decision to affirm the Court of Appeals' opinion upholding petitioner's conviction and sentence.  I write separately to emphasize the standard under which petitioner's fair trial claim should be analyzed.  Further, although I find the trial judge did not abuse his discretion in denying petitioner's motion for a speedy trial, I concur with the majority's opinion in result only.

In South Carolina, to establish deprivation of a fair trial due to the destruction or loss of evidence, a defendant must show: (1) the State destroyed the evidence in bad faith; or (2) the evidence possessed an exculpatory value apparent before the evidence was destroyed, and the defendant cannot obtain other evidence of comparable value by other means.  *State v. Cheeseboro*, 346 S.C. 526, 538–39, 552 S.E.2d 300, 307 (2001).  While I understand the majority's exclusive reliance on *Arizona v. Youngblood*, 488 U.S. 51 (1988), is likely due to petitioner's failure to preserve for appellate review his argument under the second prong of *Cheeseboro*, in my view, it is worth noting that the analysis in South Carolina is more expansive than *Youngblood*, and includes a second prong as articulated in *Cheeseboro*.

I concur in the majority's decision to affirm the Court of Appeals.