# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent.

v.

Rickey Santoine Henley, Appellant.

Appellate Case No. 2016-000844

———————

Appeal From Abbeville County
Eugene C. Griffith, Jr., Circuit Court Judge

———————

Opinion No. 5694
Heard February 12, 2019 – Filed December 11, 2019

———————

## AFFIRMED

———————

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., and Assistant Attorney General Vann Henry Gunter,
Jr., of Columbia, and Solicitor David Matthew Stumbo,
of Greenwood, all for Respondent.

———————

**MCDONALD, J.:**  Rickey Santoine Henley appeals his first degree burglary
conviction, arguing the circuit court erred by (1) finding his prior larceny acquittal
did not bar his retrial for burglary; (2) excluding evidence of the prior larceny
acquittal; (3) limiting the admission of a witness's prior trial testimony; and (4)
admitting evidence of DNA testing conducted on a cigarette butt found at the crime
scene.  We affirm.

**Facts and Procedural History**

On the morning of February 15, 2012, Richard Culbreth drove past the Abbeville County home of Amanda Moss (Victim) and her husband Jamie Moss (Husband) while on the way to visit his mother.[1] Culbreth saw a gray car backed into Victim's carport with the back door open and a black male running from the home's front door to a side door. As Culbreth found this unusual, he turned around and drove back to Victim's house, where he observed the same man standing in the doorway.

After spotting Culbreth, the alleged intruder got into his car, pulled out of Victim's driveway, stopped in front of Culbreth's pickup truck—which was pulling a trailer with a lawn mower—and asked him if he needed any help with lawn care. Culbreth replied he did not need any help, and the man drove away, merging onto Highway 28 North toward Anderson County. Culbreth called 911 and described the car as a dirty, gray, late 1980s or 1990s model Pontiac with the license plate number "HSN 454." Culbreth described the man as having facial hair and testified, "I just remember he had a bandana tied tightly around his head. It went down the back of his neck. Light-skinned from what I could tell. But I do not remember any, you know, marks, facial scars, or anything."

Deputy Patrick Thompson, a detective in the Abbeville County Sheriff's Office (ACSO) property crimes division, responded to Victim's home. While processing the scene, Deputy Thompson noticed a footwear impression on the carpet. Officers recovered a cigarette butt from the intruder's point of entry, which they collected and placed into evidence.[2] The sole item missing from Victim's home was a Dell laptop computer, valued at five hundred dollars, which Victim reported had been on a bench just inside the carport door.[3]

---

[1] Culbreth works as the caretaker for Long Cane Cemetery on Beltline Road in Abbeville. He testified he knew Victim through her former employer, Harris Funeral Home.

[2] The DNA profile developed from the cigarette butt matched Henley's DNA profile. Trial testimony established the probability of randomly selecting an unrelated individual with a DNA profile matching the cigarette butt was 1 in 1.5 billion.

[3] Victim's laptop was never recovered.

At trial, Victim identified photographs of the side carport door, which was partially broken off its hinge and appeared to have been tampered with; the doorframe was also damaged. Victim testified a cigarette butt found near her steps did not belong to her or Husband as neither smoked, and the cigarette was not there when she left the home that morning. Victim noted she normally locked the door to the house when she left. Likewise, Husband testified the door was locked and there was no cigarette butt on the steps when he left the house.

Deputy Thompson used Culbreath's description and tag number to search for the suspect vehicle on the South Carolina Law Enforcement Division (SLED) vehicle database. The search revealed a 1997 Pontiac Bonneville owned by Henley and his then girlfriend, Jolene Gray, bearing the license plate number "HSN 544." Based on information he received from the Department of Motor Vehicles, Deputy Thompson went to Henley's Anderson County residence on February 22, 2012. Parked outside, he saw a Pontiac Bonneville matching the description provided by Culbreath with the license plate "HSN 544".

Henley was at the residence and spoke with law enforcement. He admitted he had recently been in Abbeville and acknowledged he had been on Highway 28. Henley recalled speaking to someone in a pickup truck and admitted he smoked Newport cigarettes. Deputy Thompson noticed Henley was wearing boots, the soles of which resembled the impression left on Victim's carpet. Henley was arrested for first degree burglary and larceny on February 23, 2012.[4]

According to Gray, five police officers came to her house a second time when Henley was not there. She stated she saw the officers walking around, and one officer picked something up off of the ground. Regarding Henley's location on the day of the burglary, Gray claimed Henley left their Anderson County apartment between 8:00 a.m. and 9:00 a.m. to go to his mother's house in Beech Island.[5] Gray confirmed Henley owned a pair of boots and smoked Newport cigarettes.

Henley's mother, Ella Johnson, stated that on February 15, 2012, Henley arrived at her home at approximately 10:00 a.m. with leftover shrimp and lobster from his

---

[4] Henley has two prior burglary convictions from December 7, 2006, and March 15, 2002.

[5] Beech Island is an unincorporated community in Aiken County.

Valentine's Day dinner with Gray. Johnson testified she and Henley went to Moe's Convenience Store at approximately 2:00 p.m.

Henley's first jury trial began April 8, 2015. Following an *Allen* charge, the jury returned a verdict of not guilty on the larceny charge connected with the burglary at Victim's home. However, the jury hung on the first degree burglary charge, and the circuit court declared a mistrial on April 9, 2015. After the circuit court's denial of Henley's motion to preclude retrial under the Double Jeopardy Clause of the Fifth Amendment, Henley was retried on the burglary charge. The jury found Henley guilty of first degree burglary, and the circuit court sentenced him to twenty-four years' imprisonment.

**Law and Analysis**

**I. Double Jeopardy**

Henley argues the circuit court erred by denying his motion to quash the burglary indictment on double jeopardy grounds because (1) it failed to apply the proper test of *Yeager v. United States*, 557 U.S. 110 (2009)*, and (2) his prior acquittal on the larceny charge relating to the Dell computer necessarily determined he was "not guilty" of burglary as the sole item missing following the burglary was the Dell laptop. We disagree.

At Henley's first trial, the jury acquitted Henley of the larceny of Victim's Dell computer but was unable to reach a unanimous verdict on the first degree burglary charge. Prior to the start of his second trial, Henley moved to quash the burglary indictment, arguing any retrial would violate both the federal and state Double Jeopardy Clauses. Following a pretrial hearing, the circuit court concluded:

> Here's what I think. I understand your argument. I think it's a directed verdict to fact [sic] question as to whether they conclude and get past directed verdict stage. With the intent to commit a crime therein is one of the elements of burglary first and second and third. The State's got that burden of proving with the intent to commit a crime. I don't believe the acquittal of the larceny precludes them from presenting facts which the jury could prove intent to commit a crime therein. They have not had that opportunity yet. So I think your motion should be denied right now, but I feel confident you will

most likely renew it at the directed verdict stage in a similar-worded argument if the State's failed to prove anything beyond a suggestion of intent to commit a crime therein. So I don't believe jeopardy attaches to the [burglary] charge since it's not a specific crime. The indictment does not get quashed at this point, but the Court will be listening.

The Double Jeopardy Clauses of the United States and South Carolina Constitutions protect citizens from being subjected to repetitive conclusive prosecutions and multiple punishments for the same offense. U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ."); S.C. Const, art. I, C ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty . . . ."). "In interpreting the Double Jeopardy clause, [our supreme court] has stated that '[t]he Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal or conviction, and protects against multiple punishments for the same offense.'" *State v. Brandt*, 393 S.C. 526, 538, 713 S.E.2d 591, 597 (2011) (quoting *Stevenson v. State*, 335 S.C. 193, 198, 516 S.E.2d 434, 436 (1999)). However, "[a] defendant may be severally indicted and punished for separate offenses without being placed in double jeopardy where a single act consists of two 'distinct' offenses." *Id*. (quoting *State v. Moyd*, 321 S.C. 256, 258, 468 S.E.2d 7, 9 (Ct. App. 1996)).

The doctrine of issue preclusion is embodied in the Fifth Amendment's Double Jeopardy Clause. *Ashe v. Swenson*, 397 U.S. 436, 445–46 (1970). Issue preclusion means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. In *Ashe*, the United States Supreme Court explained that "'collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice." *Id.* at 443. In emphasizing the rule of collateral estoppel in criminal cases should be applied with "realism and rationality," the Court advised:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an

> issue other than that which the defendant seeks to
> foreclose from consideration."

*Id.* at 444. *Ashe* is not dispositive here as the issue determined there was "simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the State could constitutionally hale him before a new jury to litigate that issue again." *Id.* at 446.

*Yeager v. United States*, 557 U.S. 110, 113 (2009), which involved charges of securities fraud and insider trading, is more helpful to our analysis. There, the Supreme Court examined an issue preclusion challenge involving an attempted retrial after the jury acquitted the defendant on the securities fraud counts but could not reach a verdict on his insider trading charges. *Id.* at 115. When the prosecution subsequently sought to retry the defendant on the insider trading counts, the defendant moved to dismiss, arguing the acquittals on securities fraud precluded his retrial for insider trading. *Id.* The district court denied the motion, concluding the question of whether the defendant possessed insider information was not necessarily resolved in the first trial. *Id.* at 116–17. Although *Yeager* is distinguishable from *Ashe* in that *Yeager* involved an acquittal on some counts and a hung jury on others, the Supreme Court explained "the reasoning in *Ashe* is nevertheless controlling because, for double jeopardy purposes, the jury's inability to reach a verdict on the insider trading counts was a nonevent and the acquittals on the fraud counts are entitled to the same effect as Ashe's acquittal." *Id.* at 120. The Supreme Court subsequently found, "if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." *Id.* at 123.

Here, Henley's acquittal for larceny—the taking of the Dell computer—is not dispositive of whether the State could satisfy the elements necessary for a first degree burglary conviction. In *Yeager*, there could be no insider trading if, as found by the jury, there had been no fraud. But an acquittal for larceny does not foreclose any element necessary for a first degree burglary conviction. *See* S.C. Code Ann. § 16-13-30(A) ("Simple larceny of any article of goods, choses in action, bank bills, bills receivable, chattels, or other article of personalty of which by law larceny may be committed, or of any fixture, part, or product of the soil severed from the soil by an unlawful act, or has a value of two thousand dollars or less, is petit larceny, a misdemeanor, triable in the magistrates court or municipal court. . . ."); S.C. Code Ann. § 16-11-311(A) ("A person is guilty of burglary in the first degree if the person enters a dwelling without consent and with intent to

commit a crime in the dwelling, and either: (1) . . . ; or (2) the burglary is committed by a person with a prior record of two or more convictions for burglary or housebreaking or a combination of both; or (3) . . . ." ). While larceny is defined as "the felonious taking and carrying away of the goods of another against the owner's will or without his consent," *State v. Moore*, 374 S.C. 468, 477, 649 S.E.2d 84, 88 (Ct. App. 2007), burglary merely requires that "the person enters a dwelling *without consent* and *with intent to commit a crime* in the dwelling." S.C. Code Ann. § 16-11-311(A) (emphasis added). Each of the offenses requires proof of different critical elements. *See Blockburger v. United States*, 284 U.S. 299, 304, (1932) ("The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

Additionally, we agree with the State that the jury's "not guilty" verdict was not necessarily a finding that Henley was not the individual who entered Victim's home without consent and with intent to commit a crime therein; rather, the prior jury found only that the State failed to prove beyond a reasonable doubt that Henley took the Dell computer. Henley's acquittal on the larceny charge did not preclude the State from presenting facts—that Henley's car was backed into Victim's carport with the back door open, Culbreth witnessed Henley standing in the doorway of Victim's home, and Victim's door and doorframe were damaged— as proof of the first degree burglary charge.

In *State v. Mitchell*, 399 S.C. 410, 422, 731 S.E.2d 889, 896 (Ct. App. 2012), the defendant sought relief from his conviction for burglary in the first degree, contending the intent to steal element could not be proven since the jury found Mitchell not guilty of petit larceny. This court noted Mitchell seemed to be referencing the "inconsistent verdict theory" and stated:

> Mitchell was charged and convicted of first-degree burglary, pursuant to section 16-11-311(A) of the South Carolina Code (2003). The pertinent portion of the statute states: "A person is guilty of burglary in the first degree if the person enters a dwelling without consent and *with intent to commit a crime in the dwelling . . . .*" S.C. Code Ann. § 16-11-311(A)(2003) (emphasis added). Mitchell was identified from photographs on the deer camera in Potts's home. Potts testified that he did not recognize the person in the photographs and had not

given permission for that person to be in his home. There was testimony Mitchell held a bag and a flashlight in one of the photographs, and the photograph was admitted into evidence. A jury could have inferred that Mitchell intended to commit a crime while in Potts's home, and due to a multitude of scenarios, was unable or decided not to carry out the intended crime.

*Id.* at 422–23. Like the defendant in *Mitchell*, Henley conflates the intent to commit a crime with the successful commission of the crime. Although the jury in Henley's first trial found the State failed to prove the larceny charge, there was no requirement that the State actually prove he successfully committed a separate crime within Victim's home to prove the burglary charge. *See State v. Peterson*, 336 S.C. 6, 7, 518 S.E.2d 277, 278 (Ct. App. 1999) ("The fact that the jury failed to convict Peterson of the sexual assault charge does not affect the validity of the burglary charge. Indeed, that fact is immaterial."). Because Henley's acquittal for larceny did not settle the critical issue of ultimate fact as to whether he entered Victim's home without consent with the intent to commit a crime, the State was not precluded from retrying him for first degree burglary. Accordingly, we find the circuit court properly declined to quash the indictment and properly denied Henley's motion for a directed verdict.

## II. Larceny Acquittal

Henley argues the circuit court erred by excluding evidence of his acquittal on the larceny charge where the State maintained its theory that the burglar's intention in entering Victim's home was to steal. We disagree.

At Henley's second trial, he sought to introduce the self-authenticating copy of the larceny indictment from his first trial, arguing it was exculpatory information. Conversely, the State argued the evidence was wholly irrelevant and had no bearing on the jury's determination of Henley's burglary charge. The circuit court ruled:

I don't believe this is allowed. I think it would confuse the jury. It does mention the same date, the same victim, and a piece of [personalty]. To some extent[,] it opens the door to a whole slew of issues. But it seems to me this would confuse the jury more than help the jury in

> their findings of fact as to his guilt or innocence on this charge.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *See State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* "To warrant reversal, an error must result in prejudice to the appealing party." *State v. Black*, 400 S.C. 10, 16–17, 732 S.E.2d 880, 884 (2012).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina. Evidence which is not relevant is not admissible." Rule 402, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case." *State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007). "'Probative' means '[t]ending to prove or disprove.'" *State v. Gray*, 408 S.C. 601, 609–10, 759 S.E.2d 160, 165 (Ct. App. 2014) (quoting *Probative Value*, Black's Law Dictionary (9th ed. 2009)). "'Probative value' is the measure of the importance of that tendency to the outcome of a case. It is the weight that a piece of relevant evidence will carry in helping the trier of fact decide the issues. '[T]he more essential the evidence, the greater its probative value.'" *Id.* (quoting *United States v. Stout*, 509 F.3d 796, 804 (6th Cir. 2007)).

Here, Henley's acquittal on the larceny charge was irrelevant; it did not make the existence of any fact of consequence in the proceeding more or less probable with respect to the elements of first degree burglary. *See* Rule 401, SCRE (defining relevance). While the State was required to prove Henley entered Victim's home without her consent and with the intent to commit a crime, there was no requirement that the State prove Henley entered Victim's home without consent and successfully committed the crime of taking Victim's Dell computer.

Henley further argues the circuit court failed to conduct the necessary Rule 403 balancing analysis; however, our review of the record reveals the circuit court made an express finding that the evidence "would confuse the jury more than help the jury in their findings of fact as to his guilt or innocence on this charge." Thus, we find the circuit court properly applied Rule 403 in excluding evidence of the larceny acquittal. Even assuming, arguendo, that the evidence was relevant, the circuit court did not abuse its discretion in determining that any probative value was substantially outweighed by the danger of unfair prejudice and misleading the jury. The evidence of Henley's prior acquittal had little to no probative value as it did not prove or disprove any element necessary to the first degree burglary charge; yet, admission of the evidence would have likely led to jury confusion because it would have invited the jury to speculate about what occurred at the first trial. *See* Rule 403, SCRE (explaining that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."). Therefore, we affirm the circuit court's exclusion of evidence of the larceny indictment and resulting "not guilty" verdict from Henley's earlier trial.

## III. Jolene Gray's Testimony

Henley argues the circuit court erred by limiting the admission of Jolene Gray's testimony from the first trial where Gray was unavailable to the defense during the second trial and her testimony provided evidence that the police had an opportunity to obtain a cigarette smoked by Henley from outside of his own home. We disagree.

On cross-examination during Henley's first trial, Gray claimed law enforcement returned to the residence she shared with Henley on a second occasion when he was not present. On re-direct, Gray testified:

> The second time they came, it was five of them, I think. One was at the back, four in the front. My son was living with me at the time. [Henley's] car [was] there. My car there and my son's car. They was walking around the grounds, you know, picking up. What they were picking up, I have no idea. But they was walking around. Yes.

In the first trial, Henley referenced Gray's testimony during his closing argument in support of the defense theory that the State's DNA evidence was not credible because of poor investigative protocols, noting:

You also remember Officer Thompson isn't really sure what other officers were there. And that's another thing that's not good enough. He doesn't know which officers were there. An officer he says was there doesn't remember being there. But [Gray] said that one of the times the officers came to talk to [Henley], there were some cars parked out and she saw the officers picking stuff up. [Gray] didn't know what they were picking up. It may seem crazy, crazy for us to ask you to draw an inference they were picking up a cigarette butt. But what is equally crazy, is that we've got all this lost evidence in this case and we know it's lost. You would think, you know, that things like this don't happen, but they really do. And the State acknowledges that these things happen. So it's really not that far of a stretch to say, well, maybe, maybe they picked something up that day. Because we don't know where that cigarette butt was until March 29th of 2012. And, again, you heard from the SLED agent all the care that they take. And that they had that cigarette butt from March 29th until sometime in August of 2012. They tested it in August. They sent it back to the agency in 2012. But yet she doesn't return her actual analysis until January 2013.

At the retrial, Henley moved to admit Gray's testimony from the first trial. Defense Counsel stated:

Ms. Gray was the client, my client's girlfriend. She had some testimony, we have been unable to locate her. I can have our investigator come up and we can have her testify as to all of the efforts that she made to try to locate Ms. Gray. But we would ask under Rule 804(b)(1), [SCRE,] which is the hearsay exception where declarant is unavailable[,] to introduce Ms. Gray's testimony from the previous trial.

The State replied, "Judge, I really don't have an objection to it. If we were in the same boat, I'd be asking the same thing." The circuit court granted Henley's motion. Thereafter, the State informed the circuit court, "And, Judge, we are going

to probably try to ask our investigator if he can find Ms. Jolene Gray just to see if there is a reason why she's not showing, though." The court replied, "Okay. If you can find her, get her." Defense Counsel indicated she was "fine with that."

After the State rested its case-in-chief, the solicitor stated:

> Judge, it's my understanding that there are two potential defense witnesses that are not here . . . . one is Jolene Gray; is a former girlfriend of [Henley] . . . . We did, after yesterday, it was brought to our attention, we were able to contact her through our office, our investigator contacted her and she said she's in Anderson. She's never received a subpoena. Judge, I understand that [Henley] just wants to read in a prior transcript of her testimony. Your Honor, my, you know, we're not going to oppose that, but in my cross from a prior hearing, I'm only going to read a portion of it. And then I put on the record, I think, and once I stop at that one portion, that would, the reading of redirect from the Defense would be outside the scope of our cross.

Henley responded:

> Your Honor, the redirect portion goes to the officers coming out a second time, searching the home and not finding anything, leaving, searching the premises. The witness says that perhaps someone picked up something off the ground and we would want all of that testimony to come in to show that no items were collected, a doo-rag, burglary tools from the home since Mr. Henley did live there. It's our position that the entire testimony should come in.

The circuit court observed, "Well, now, we don't know whether something was picked up off the ground or not. That's unknown. She's speculating." Ultimately, the court ruled:

> All right. I think I'm going to grant [the State's] motion to limit [its] cross-examination to where [it] wants to stop. But I do not believe that will limit you or . . . ,

whichever one closes, in saying nothing was taken or
recovered from the house or you'd have seen it here
today.  I think y'all could say something along those lines
in your closing argument and you can summarize it, had
they gone and found something in that search, certainly it
would be here.  It's not here.

Rule 804(b)(1), SCRE, provides for the admission of former testimony where the
declarant is unavailable as a witness.  Specifically, it allows the admission of
"[t]estimony given as a witness at another hearing of the same or a different
proceeding . . . , if the party against whom the testimony is now offered . . . , had
an opportunity and similar motive to develop the testimony by direct, cross, or
redirect examination."  *Id.*  One of the situations in which a declarant is deemed
"unavailable" for purposes of the rule is when the declarant "is absent from the
hearing and the proponent of a statement has been unable to procure the declarant's
attendance . . . by process or other reasonable means."  Rule 804(a)(5), SCRE.

Henley represented that his investigator had been unable to locate Gray in order to
serve a subpoena, but that if the State could find Gray and procure her attendance,
he had no objection.  Although the State was able to contact Gray at her Anderson
County residence, the relevant inquiry is whether Henley was able to procure
Gray's attendance by process or other reasonable means.  The State confirmed
Henley's statement that Gray had not been served with a subpoena.  While the State
again represented that it did not oppose the reading of the testimony, the solicitor
argued Henley should only be permitted to read the portion of his redirect
examination responsive to the cross, consequently excluding the redirect testimony
Henley sought to procure.  Notably, the State did not argue any evidentiary basis
for excluding Gray's testimony, and it did not object to her testimony on redirect
during Henley's first trial.  However, because Rule 804(a)(5) requires the
declarant's unavailability despite "process or other reasonable means," we believe
Gray's testimony was inadmissible hearsay.  *See* Rule 220(c), SCACR ("The
appellate court may affirm any ruling, order, decision, or judgment upon any
ground(s) appearing in the Record on Appeal.").  Our review of the record reveals
the circuit court ruled as much without specifically citing Rule 804(a)(5).

Nevertheless, we are concerned that instead of excluding all of Gray's testimony
from the prior trial, the circuit court allowed the State to select the portions of her
former testimony to be read, while excluding the portion Henley sought to present.
However, we do not find this error prejudiced Henley.  *See e.g.*, *State v. Adams*,
354 S.C. 361, 381, 580 S.E.2d 785, 795 (Ct. App. 2003) ("[A]n insubstantial error

not affecting the result of the trial is harmless where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.'" (quoting *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989), *cert. denied*, (2004)). Culbreth testified he witnessed a black male at Victim's home around 11:30 a.m. on February 15, 2012; he accurately described Henley's Pontiac sedan, was able to provide law enforcement with a partial plate number matching Henley's license plate, and recounted an interaction with the intruder. Henley admitted to law enforcement that he had recently been in Abbeville and acknowledged he had been on Highway 28. Henley also recalled speaking to someone, presumably Culbreth, driving a pickup truck in Abbeville. Finally, Victim testified the door to her home was intact when she left for work that morning and damaged when she returned home. Thus, to the extent the circuit court erred in allowing the State to pick and choose portions of Gray's prior testimony after agreeing to admit it, we find such error was harmless.

## IV. DNA Testing

Henley argues the circuit court erred in denying his motion to exclude evidence of DNA testing conducted on the cigarette butt found at the crime scene because the State could not present a complete chain of custody and the cigarette butt was not available for comparison to the crime scene photograph at trial. Henley further asserts the State's negligence in the destruction of the cigarette butt constituted bad faith. We disagree.

During his direct examination at Henley's second trial, Deputy Thompson explained the procedure for preserving evidence of the cigarette butt found at Victim's residence:

> The cigarette you would document it by photograph and place. And then a DNA article, which is what it's been collected for, fresh gloves, we put it into a paper bag and not seal it in any kind of plastic that would destroy the evidence for lack of oxygen. And it would be submitted into a clean new bag.

Deputy Thompson testified he picked the cigarette butt up, placed it into the evidence bag, and sealed it with tape. No other officers handled the cigarette butt prior to his arrival at the crime scene. Deputy Thompson explained that after collecting the evidence, the next step is to take the evidence to the law enforcement

center where it is either placed in a secure drop-box or handed directly to Chief Marion Johnson, who was the evidence custodian at the time.

Chief Johnson was employed as the Chief Deputy of the Abbeville County Sheriff's Office (ACSO) from 1989 to 2013. He was also the ACSO's evidence custodian. Chief Johnson testified that after Deputy Thompson collected and secured the cigarette butt, it was turned over to him. Chief Johnson logged in the evidence and put it in the evidence locker. On March 29, 2012, Chief Johnson gave the cigarette butt to Investigator Ryan Abernathy, who transported it to SLED. Before sending the bag to SLED, Chief Johnson confirmed the bag had not been tampered with. Investigator Abernathy later transported the cigarette butt back to ACSO from SLED.

Maryanne Boehm, who is employed in the DNA casework department at SLED, received the Newport cigarette butt for testing from Investigator Abernathy on March 29, 2012. Regarding procedure, Boehm testified:

> So the cigarette butt is placed into a heat-sealed SLED pouch that is sealed and dated and initialed by the submitted investigator. It is then put on a secure shelf in the evidence vault. Not many people have access to this. Just the forensic technicians in evidence control and administration are the only ones who have access to this evidence storage location. Then, when I was assigned the case, I retrieved the evidence through an evidence technician, Amy Stevens. She retrieved the evidence, and then handed it to me and I took it into my custody at that time.

Boehm subsequently performed a DNA analysis on the cigarette butt in August 2012. Upon being shown the photograph of the cigarette butt collected at Victim's home, Boehm testified it was consistent with the cigarette butt she tested. She explained the DNA profile developed from the cigarette butt matched Henley's DNA profile. After the positive result, Boehm issued a report of her findings in January 2013, and returned the evidence back to SLED's evidence control unit.

The following colloquy ensued between the State and Boehm:

> Q: Now, Ms. Boehm, I showed you a picture of the cigarette butt, but I didn't actually show you the butt that

you tested in the package today.  Does that change the
fact of your DNA outcome, your results?

A:  No, sir.

Q:  So you seeing that here today does not change your
interpretation or the results?

A:  No, sir, not at all.

Q:  And you're saying today that on the day it was
submitted to you[,] you did your testing, that the integrity
of the bag was intact?

A:  Yes, sir.

Q:  There was no tampering with it at all?

A:  That's correct.

At the time of Chief Johnson's retirement in May 2013, all evidence obtained in
Henley's case was still in the evidence room.  Sometime after the evidence was
returned from SLED to ACSO, it was either destroyed or misplaced.  Prior to trial,
Henley moved to suppress any testimony or mention of the cigarette butt.
Ultimately, the circuit court ruled:

> I don't think it's suppressed, though.  Now, on that, I'm
> going to leave it more or less a motion in limine, because
> the summary by both of y'all as to the facts, because a
> summary of facts is not sworn testimony.  If we get in
> trial and I hear something different, I may change my
> mind . . . .  It seems more to be a motion in limine and
> that's how I'm ruling on it.  Assuming everything comes
> in as y'all outlined it; that will be my findings.  It will be
> a careless or negligent losing of the evidence but will be
> admitted; the DNA result will be.  Assuming the
> foundation for all the others can be met, but if the
> testimony doesn't support what y'all have outlined, then I
> may change my ruling and you can renew that motion

> and suppress.  That make sense?  I think that's the best
> way to handle it.

Henley contends the State's negligence in maintaining the evidence constitutes bad faith.  He also asserts the State presented an insufficient chain of custody because the physical cigarette was not available for comparison to the crime scene photograph at trial.  We disagree.  Initially, we note Henley failed to present any evidence of bad faith on the part of law enforcement in losing the cigarette butt.  Moreover, the State presented a clear and complete chain of custody of the cigarette butt from the time of collection through the item's testing by SLED and its subsequent return to ACSO.

As a threshold matter, we question whether this argument is preserved for review because Henley failed to renew his objection to the admission of this evidence during Boehm's testimony.  In its ruling, the circuit court explained it was making a ruling in limine, and that its ruling was subject to change.  Thus, it was incumbent upon Henley to contemporaneously object in order to get a final ruling and preserve the issue for appellate review.  *See State v. Hoffman*, 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994) ("A contemporaneous objection is required to properly preserve an error for appellate review.").

Still, even if this argument were properly preserved, we find it to be without merit.  "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  While the fundamental fairness standard requires criminal defendants to be given a meaningful opportunity to present a complete defense, to set forth a due process violation, a criminal defendant "must demonstrate either that the state destroyed evidence in bad faith, or that the state destroyed evidence that possessed an exculpatory value that is apparent before the evidence was destroyed and the defendant cannot obtain other evidence of comparable value by other means." *State v. Mabe*, 306 S.C. 355, 358–59, 412 S.E.2d 386, 388 (1991); *see also State v. Cheeseboro*, 346 S.C. 526, 538–39, 552 S.E.2d 300, 307 (2001) (affirming circuit court's denial of defendant's motions to suppress and to dismiss indictments where there was no bad faith in destruction of gun, bullets were still available to the defense, and "there was no prejudice to the defense because the gun was incriminating rather than exculpatory"); *State v. Reaves*, 414 S.C. 118, 129, 777 S.E.2d 213, 218 (2015) (finding that although multiple pieces of evidence were collected at the crime scene but missing at the time of trial, the errors made did "not indicate bad faith as is required to dismiss an indictment under the federal constitutional test").

Here, Henley is unable to make the showing of bad faith required to support exclusion of the DNA evidence. While the State admittedly lost the cigarette butt before trial, the only evidence presented was that it was returned from SLED to ACSO and then was either destroyed or misplaced following Chief Johnson's retirement. Bad faith cannot be inferred simply because the evidence was lost. *See State v. Breeze*, 379 S.C. 538, 546, 665 S.E.2d 247, 251 (Ct. App. 2008) ("The foregoing demonstrates the State's actions were not in bad faith but rather an inadvertent mistake.").

Furthermore, while the DNA test result was certainly critical evidence, the presence of the cigarette butt itself would have done nothing to change the report generated from SLED's processing of that evidence. The presence of the physical cigarette for comparison would have contributed nothing of value, as Henley would have undoubtedly noted the cigarette was a nondescript item without any significant or distinguishing markings. Finally, as this evidence was inculpatory rather than exculpatory, the presence of the physical cigarette would have been more damaging to Henley's defense than its absence.[6]

As to Henley's argument concerning the chain of custody, the absence of the cigarette butt at trial did not render the chain of custody incomplete. Although the whereabouts of the cigarette butt were accounted for from the time of its collection on February 15, 2012, through the time it was returned to ACSO after the SLED testing, we acknowledge there was no testimony regarding the date on which the cigarette was initially logged into the evidence locker at ACSO. *But see State v. Hatcher*, 392 S.C. 86, 95, 708 S.E.2d 750, 755 (2011) ("The ultimate goal of chain of custody requirement's is simply to ensure that the item is what it is purported to be."). Notably, "[c]ourts have abandoned inflexible rules regarding the chain of custody and the admissibility of evidence in favor of a rule granting discretion to the trial courts." *Hatcher*, 392 S.C. at 94, 708 S.E.2d at 754. We find the chain of custody of the cigarette butt from the time of collection through testing was sufficient, and the circuit court properly exercised its discretion in admitting evidence of the DNA collection and test results.

---

[6] Instead, the fact that the evidence was lost provided Henley with considerable ammunition with which to criticize the State's investigation. *See Reaves*, 414 S.C. at 128, 777 S.E.2d at 218 ("Further, to the extent Reaves was disadvantaged by the State's loss of evidence, Reaves' attorney was allowed to forcefully cross-examine the police officers on the deficiencies in their investigation.").

**Conclusion**

For the foregoing reasons, Henley's conviction is

**AFFIRMED.**

**LOCKEMY, C.J. and SHORT, J., concur.**