In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00438-CR**

**DAVID BROADUS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 18-28797**

**MEMORANDUM OPINION**

A jury found Appellant David Broadus guilty of the aggravated assault of Pauline[1] and assessed punishment at fourteen years of confinement. The trial court sentenced Broadus to fourteen years of confinement and entered a deadly weapon finding. Raising three issues, Broadus appeals. We affirm the trial court's judgment.

---

[1] We refer to victims by a pseudonym to conceal their identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

Detective Eric Thomason with the Port Arthur Police Department testified that on January 25, 2018, he responded to a five-vehicle accident on Highway 69 in Port Arthur, and dispatch had advised the wreck was possibly the result of shots being fired. The driver of the white vehicle, Joseph, had been shot and died at the scene from the gunshot wound. According to Detective Thomason, once Joseph had been shot, the vehicle he was driving crossed over to the wrong side of the road, hit a vehicle driven by Pauline, and then hit other vehicles. Pauline testified that she did not remember the accident, but that she was seriously injured in the accident and spent weeks in the hospital and months in therapy. A witness working nearby testified that he saw a gray car chasing a white car and speeding down Highway 69 that day, he saw an arm come out of the gray car's passenger side, and he heard shots fired prior to the crash. A surveillance video camera from a nearby store captured the wreck, and a copy of the video was admitted into evidence and published to the jury. Detective Thomason testified that he and Detective Cater responded to a tip that the shooting at the crash scene involved an altercation that had originally started at the Lowe's store in Port Arthur.

A loss prevention manager at Lowe's testified that he made a copy of surveillance video from the Lowe's parking lot that day and provided it to law enforcement, and the video was admitted into evidence and published to the jury.

According to the manager, one of the vehicles that was involved in an altercation in the parking lot was a silverish-gray Jeep SUV owned by a Lowe's cashier, and one of the men on the video involved in the altercation was the fiancé of that employee. The manager testified that even though he had no direct interaction with that man in the video, he recognized him because the man briefly worked at Lowe's and since then would regularly come in the store and talk to the cashier who was his fiancé. The manager testified that the video depicted the man leave the store suddenly, run into the parking lot, meet two other people, get into the Jeep, drive to the right side of the parking lot, and meet up with a white four-door vehicle. According to the manager, two others were in the vehicle with the cashier's fiancé and "[t]hey got out of the car, got back in really quickly because the white car pulled off and took off and then the silver vehicle followed quickly after them." When shown pictures of the white vehicle involved in the crash, the manager testified that it appeared to be the same white vehicle from the Lowe's surveillance video.

Detective Terry Cater with the Port Arthur Police Department testified that he responded to the scene and then followed up with the lead at Lowe's. He met with the Lowe's employee the manager had identified who told Detective Cater that her fiancé, James Levron, was driving the Jeep in the video. Detective Cater testified that he met with Levron and learned that he was driving at the time of the shooting, that Broadus was in the front passenger's seat, and that John Bertone was in the back

3

seat. Detective Cater testified that based on a tip from Hector Martinez that on that day Martinez saw Levron and Broadus at Martinez's auto body garage and he saw Broadus come from behind the building with a shovel, law enforcement searched the property behind Martinez's garage a few days later. Behind Martinez's shop, law enforcement recovered a handgun frame buried in mud, firearm components in another hole nearby, and a black shirt wrapped around a firearm magazine. According to Detective Cater, based on his investigation, he believed Broadus was the shooter and Broadus was charged with the murder of Joseph and the aggravated assault of Pauline.

Brandy Henley, a forensic scientist firearms examiner at the Jefferson County Regional Crime Lab, testified that she received parts of a firearm in this case and once she reassembled the parts and borrowed a missing firing pin spring and firing pin spring keeper from another firearm, the firearm was functional. Henley also testified that the spent bullet recovered from Joseph's body during an autopsy came from the same caliber class as the firearm she assembled and test-fired.

Kerri Todd, a forensic scientist with the Texas Department of Public Safety crime laboratory, testified that no DNA profile was obtained from the parts of the handgun recovered in this case. She also testified that, as for the black shirt recovered in the case, the results of the DNA extracting of the shirt were as follows:

> [T]he partial DNA profile is interpreted as a mixture of three individuals. Obtaining this mixture profile is 149 billion times more

4

likely that the DNA came from David Broadus and two unknown individuals than if the DNA came from three unrelated, unknown individuals. Based on this likelihood ratio result, David Broadus cannot be excluded as a possible contributor to the profile. Based on the likelihood ratio result, it is inconclusive whether James Levron is a contributor to the profile and [Joseph] is excluded as a contributor for the profile.

James Levron testified that he and Broadus had been friends for about ten years and started a fence company together. According to Levron, on January 25, 2018, he took his truck to his friend Hector Martinez's shop, Levron left his truck, and Levron took Martinez's truck to get fencing material from Lowe's because Martinez's truck could haul more material. Levron testified that when he, Broadus, and Bertone got to Lowe's, Martinez's truck had mechanical problems so Levron went and got the keys to his fiancé's Jeep from her while she was at work in Lowe's so he could go pick up a rental truck to haul the material. According to Levron, while he was getting the keys from his fiancé in Lowe's, Broadus and Bertone waived him down, he went out to the car, and they told him there was a guy in the parking lot that had stolen their company tools the prior week. Levron testified they got in the Jeep and drove to confront the person in the white Chevy, and when the car drove off, they followed it. Levron testified that as he was "doing about 80 miles an hour[]" down the highway with the windows down, Broadus was yelling at the white vehicle to pull over while Levron was honking and flashing the Jeep's lights, and when the car did not pull over, Broadus was in the passenger's seat and pulled out a gun and

5

shot at the vehicle. According to Levron, while he had intended on confronting the person in the white car to try to get his tools back, Levron did not know Broadus had a gun. Levron testified that he was shocked and "took off" and exited the freeway while the white car continued down the highway. According to Levron, they returned to Martinez's automotive shop to get their vehicles. Broadus acted nervous and asked Martinez for his keys, and he and Bertone left. Levron went back to get Martinez's truck from Lowe's, and then later Levron, Broadus, and Bertone went back to Martinez's shop to get their tools out of Martinez's truck. According to Levron, Broadus and Bertone went to the back of the shop with a shovel, and Levron thought they were going to bury the weapon. Levron testified Broadus got back in the vehicle to leave wearing a white shirt. Levron identified the shirt that was collected as evidence and was wrapped around the firearm magazine as the black shirt Broadus was wearing the day of the shooting, and Levron testified that the disassembled gun that was in evidence was similar in size to the gun Broadus used that day. Levron testified that he was initially not honest with the police about what had happened because he was scared, but later he told the truth, was arrested, and has been in custody since then.

Hector Martinez testified that he was working in his shop on the day of the shooting and that Levron, Broadus, and Broadus's cousin arrived that morning to borrow Martinez's truck to go to Lowe's to pick up materials. Martinez testified that

6

Levron lives next door and Martinez had also met Levron and Broadus before. According to Martinez, when they came back to the shop, Levron was driving James's or his wife's silver Jeep, Levron dropped off Broadus and his cousin at their vehicle at the shop, and then Levron went and got Martinez's truck at Lowe's and brought it back to Martinez. Martinez testified that all three returned to his shop that afternoon, and Martinez could hear them arguing while he was working. Martinez testified that he heard Broadus say, "Do you think I got him? Do you think I hit him?" and then he saw Levron and Broadus's cousin in the front while Broadus came from the alley behind the shop carrying a shovel. Martinez testified that he saw Levron on the news turning himself in to law enforcement for murder, and Martinez contacted his attorney regarding what he had witnessed. Martinez then provided a statement to law enforcement and consented to law enforcement looking for evidence around his property.

Analysis

In his first issue, Broadus argues that his prosecution should have been barred by collateral estoppel due to his acquittal for the murder of Joseph, and therefore, he should also be acquitted in this case. Broadus concedes he did not object on grounds of double jeopardy prior to or during trial, but he argues that no waiver occurred because it is clear on the face of the record that his aggravated assault conviction was obtained in violation of constitutional double jeopardy protections. Broadus

7

argues he was acquitted in trial cause number 18-28678, in which he was indicted for allegedly causing the death of Joseph by shooting him with a firearm. According to Broadus, he is the same person alleged as the defendant in that indictment and the indictment in the present case, the two indictments reflect the same offense dates, the same prosecutor prosecuted both cases, the jury charge in both cases identified the same accomplice witnesses and gave the same instructions regarding accomplice witnesses and law of the parties, and the reporter's records in both cases and the probable cause affidavit in the murder case show the cases involved the same sequence of events and many of the same witnesses. Broadus contends that the shooting of Joseph is an ultimate or elemental fact of the aggravated assault charge in this case, and "[w]ithout the shooting of [Joseph], Appellant cannot be held to be liable for the aggravated assault of [Pauline] because the indictment alleges that the shooting of [Joseph] led to his loss of control of his vehicle, causing it to crash into [Pauline]'s vehicle." Broadus argues that the prosecution of the present case violated *Ashe v. Swenson* and *Rollerson v. State* in that it allowed the State to relitigate the same facts after Broadus had already been found not guilty of shooting Joseph.

The State argues that Broadus failed to raise a pre-trial challenge on collateral estoppel grounds prior to trial of the aggravated assault and therefore waived the challenge. According to the State, "[i]t is not [] clear on the face of the record that there was any violation of the double-jeopardy clause, nor any legitimate collateral

8

estoppel issue." The State contends that Broadus may have been tried and acquitted on a murder charge stemming from essentially the same facts, but the murder indictment limited the jury to determining whether Broadus acted "intentionally or knowingly," and in the subsequent aggravated assault indictment the jury was not precluded from considering whether Broadus acted "recklessly" resulting in serious bodily injury to a different victim. The State argues it was not collaterally estopped from trying Broadus for an aggravated assault crime that included a reckless mental state because the jury in the murder trial only decided Broadus was not guilty of "intentionally or knowingly" causing the death of Joseph by shooting him with a firearm.

The Double Jeopardy Clause in the United States Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. This guarantee protects against multiple criminal punishments for the same offense and successive prosecutions for the same offense after acquittal or conviction. *Monge v. California*, 524 U.S. 721, 727-28 (1998); *Ex parte Denton*, 399 S.W.3d 540, 545 (Tex. Crim. App. 2013). The doctrine of collateral estoppel in a criminal case arises from the Fifth Amendment's bar against double jeopardy. *Ex parte Watkins*, 73 S.W.3d 264, 267 (Tex. Crim. App. 2002). Collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated

9

between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).[2] In the criminal law context, the collateral estoppel doctrine operates to prevent the State from contesting in any subsequent proceedings between the parties any discrete fact the jury in the previous proceeding necessarily determined in the criminal defendant's favor. *Ex parte Watkins*, 73 S.W.3d at 268. A general verdict returned in the guilt phase of a criminal trial "frequently makes it difficult to determine precisely which historical facts a jury found to support an acquittal." *Id.*

---

[2] As stated by the Texas Court of Criminal Appeals in *Ex Parte Adams*

> [U]nder the collateral-estoppel component of double jeopardy, the government may not litigate a specific elemental fact to a competent factfinder (judge or jury), receive an adverse finding by that factfinder on the specific fact, learn from its mistakes, hone its prosecutorial performance, and relitigate that same factual element that the original factfinder had already decided against the government.

*Ex Parte Adams*, 586 S.W.3d 1, 5 (Tex. Crim. App. 2019) (quoting *Rollerson v. State,* 227 S.W.3d 718, 730 (Tex. Crim. App. 2007)). The *Ashe* test is a demanding one, and *Ashe* forbids a second trial only if a conviction in the second trial requires a finding in the government's favor on an issue the jury necessarily resolved in the defendant's favor in the first trial. *Id.* A second trial "is not precluded simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question.'" *Id.* (quoting *Yeager v. United States*, 557 U.S. 110, 133-34 (2009) (Alito, J., dissenting)); *see also Ex parte Watkins*, 73 S.W.3d 264, 268-69 (Tex. Crim. App. 2002) ("The mere possibility that a fact may have been determined in a former trial is insufficient to bar relitigation of that same fact in a second trial."). Thus, courts must be able to say that "'it would have been *irrational* for the jury'" to acquit in the first trial without finding in the defendant's favor on a fact essential to a conviction in the second, in order to say that the second trial is tantamount to a trial of the same offense as the first and thus forbidden by the double jeopardy clause. *Id.* (quoting *Yeager*, 557 U.S. at 127) (Kennedy, J., concurring)).

at 269. The defendant bears the burden to demonstrate that the issue the defendant seeks to foreclose was actually decided in the first proceeding. *Guajardo v. State*, 109 S.W.3d 456, 460 (Tex. Crim. App. 2003). To determine whether collateral estoppel applies to a subsequent prosecution, courts use a two-step analysis: (1) determining exactly what facts were necessarily decided in the first proceeding, and (2) whether those necessarily decided facts constitute essential elements of the offense in the second trial. *Ex parte Taylor*, 101 S.W.3d 434, 440 (Tex. Crim. App. 2002).

Generally, a criminal defendant has the burden to preserve his double jeopardy complaint by objecting at or before the time the charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 647 (Tex. Crim. App. 2000). A defendant may forfeit a potential double jeopardy claim if he fails to properly preserve the claim. *See Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006) (citing *Gonzalez*, 8 S.W.3d at 642-43). The Texas Court of Criminal Appeals has explained that generally a defendant bringing a double jeopardy multiple prosecution claim should file a petition for a pretrial writ of habeas corpus. *Gonzalez*, 8 S.W.3d at 643 n.9. A pretrial writ is the preferred method of bringing a double jeopardy multiple prosecution claim because the defendant may immediately appeal if the trial court denied the petition. *See id*.; *Kelson v. State*, 167 S.W.3d 587, 591 (Tex. App.—

11

Beaumont 2005, no pet.).[3] That said, an appellant may still be able to raise a double jeopardy claim for the first time on appeal if two conditions are met: (1) the undisputed facts show the double jeopardy violation is clearly apparent from the face of the record, and (2) enforcement of usual rules of procedural default serves no legitimate state interest. *See Gonzalez*, 8 S.W.3d at 643; *see also Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014) (relying on *Gonzalez* for the proposition that when a defendant raises a "multiple punishment" double jeopardy claim for the first time on appeal, an appellate court must evaluate whether the face of the record that was before the trial court clearly shows a double jeopardy violation); *Langs*, 183 S.W.3d at 682 (same). A double jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings for the purpose of introducing additional evidence in support of the claim. *Ex parte Denton*, 399 S.W.3d at 544 (citing *Gonzalez*, 8 S.W.3d at 643); *Ex parte Knipp*, 236 S.W.3d 214, 216 n.3 (Tex. Crim. App. 2007) (citing *Gonzalez*, 8 S.W.3d at 642-46). "Raising the double jeopardy issue in the trial court is important insofar as it is necessary to make a clear record on which to base an appellate claim." *Guerrero v. State*, 305 S.W.3d

---

[3] The *Gonzalez* opinion did not directly address whether a collateral estoppel claim should also be the subject of a pretrial writ. *See Gonzalez v. State*, 8 S.W.3d 640, 642-46 (Tex. Crim. App. 2000). However, in the civil context, failing to present a collateral estoppel argument to the trial court constitutes waiver. *See Mayes v. Stewart*, 11 S.W.3d 440, 450 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also* Tex. R. App. P. 33.1(a) (general rule for preservation of appellate complaints).

546, 562 n.1 (Tex. Crim. App. 2009) (citing *Gonzalez*, 8 S.W.3d at 645-46). To obtain appellate review of a collateral estoppel claim, a defendant must introduce a record of the first proceeding in the second proceeding and include that entire record on appeal. *Guajardo*, 109 S.W.3d at 457.

Because Broadus failed to raise a double jeopardy claim by pretrial writ or during trial, it is his burden on appeal to prove that the undisputed facts "show the double jeopardy violation is clearly apparent on the face of the record[.]" *See Gonzalez*, 8 S.W.3d at 643. After this case was on appeal, Broadus had the clerk's record and reporter's record from the murder trial (cause number 18-28678) filed with this Court and stated the records were being filed as a "supplemental" record in this appeal. But nothing in the appellate record in this case reflects that the records from the murder trial were before the trial court in the aggravated assault case. An appellant is not permitted to supplement the appellate record with materials that have not been properly made a part of the record in the trial court. *Pena v. State*, 932 S.W.2d 33, 35 (Tex. App.—El Paso 1996, no pet.); *see also* Tex. R. App. P. 34; *Rasberry v. State*, 535 S.W.2d 871, 873 (Tex. Crim. App. 1976) (appellate courts cannot consider items that are not part of the record from the trial court); *White v. State*, 456 S.W.2d 935, 936 (Tex. Crim. App. 1970). The supplementation rules "exist to allow appellate courts to supplement the appellate record with matters that were part of the trial record but, for whatever reason, have not been forwarded to the

13

appellate court." *LaPointe v. State*, 225 S.W.3d 513, 522 (Tex. Crim. App. 2007). These rules "cannot be used to create a new record." *Id.* Accordingly, we cannot consider the clerk's record and reporter's record from trial cause number 18-28678 filed in this appeal because they are not properly before us. *See McClendon v. State*, No. 13-16-00230-CR, 2017 Tex. App. LEXIS 9768, at **3-6 (Tex. App.—Corpus Christi-Edinburg Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (where appellant asserted successive-prosecution double jeopardy claim on appeal, reporter's record from first trial filed as supplemental record on appeal of second trial could not be considered because it was not part of the trial record in the second trial and supplementation rules cannot be used to create a new record).

The appellate record in this case does not reflect that Appellant introduced the record from his murder trial (cause number 18-28678) into evidence in his aggravated assault trial, nor did he ask the trial court to take judicial notice of the record from his murder trial, and he never brought the record from the murder trial to the attention of the trial court in his aggravated assault case. *See LaPointe*, 225 S.W.3d at 522; *McClendon*, 2017 Tex. App. LEXIS 9768, at *5. Without the information from cause number 18-28678 properly before us, we cannot determine that, as Appellant has alleged, the offenses charged in the two trials are the same in law and fact or if the facts necessarily decided in the first trial constitute essential elements of the offense in the second trial. *See Ex parte Castillo*, 469 S.W.3d 165,

14

169 (Tex. Crim. App. 2015); *Ex parte Taylor*, 101 S.W.3d at 440. Because resolution of this issue would necessarily require further proceedings to introduce evidence from the first trial in support of Appellant's claim, we conclude that a double jeopardy violation is not clearly apparent from the face of the record that is properly before us. *See McClendon*, 2017 Tex. App. LEXIS 9768, at *6 (citing *Ex parte Denton*, 399 S.W.3d at 544); *see also Gonzalez*, 8 S.W.3d at 643. We overrule his first issue.

In his second issue, Broadus argues that if this Court finds that issue one was waived by his counsel's failure to object to Broadus's prosecution as being barred by collateral estoppel, then his counsel's failure to object constituted ineffective assistance of counsel. According to Broadus, the alleged ineffective assistance should result in a reversal of his conviction and an acquittal.

To prevail on an ineffective assistance claim, Appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to either make the required showing of deficient performance or sufficient prejudice defeats the claim of ineffective assistance of counsel. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*,

15

301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if Appellant rebuts the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689, *Lopez*, 343 S.W.3d at 142. The record must contain evidence of counsel's reasoning, or lack thereof, to rebut the presumption. *See Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007). We review the totality of the circumstances rather than isolated instances in determining whether counsel was ineffective. *See Lopez*, 343 S.W.3d at 143; *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In some cases, a "single egregious error" may constitute ineffective assistance of counsel. *See Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). However, an isolated failure to object generally does not constitute ineffective assistance. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984).

In this matter, the record is silent on trial counsel's reasons for not raising a double jeopardy or collateral estoppel challenge either in a pretrial motion or during the trial. Appellant did not file a motion for new trial alleging ineffective assistance of counsel or otherwise develop a record of trial counsel's reasons for his actions. Without testimony from trial counsel, the court must presume counsel had a

16

plausible reason for his actions. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). We conclude that Appellant has failed to rebut the presumption that counsel acted reasonably. *See, e.g.*, *Thompson*, 9 S.W.3d at 814; *Stephenson v. State*, 255 S.W.3d 652, 660 (Tex. App.—Fort Worth 2008, pet. ref'd). The second part of the *Strickland* test requires an appellant to show that there is a reasonable probability that the outcome of his case would have been different but for counsel's errors. *Strickland*, 466 U.S. at 694. Having concluded that Appellant failed to satisfy the requirements of the first *Strickland* prong, we need not address the second prong. *See Williams*, 301 S.W.3d at 687. We overrule Broadus's second issue.

In his third issue, Broadus argues the trial court's judgment should be modified to delete the affirmative finding of a deadly weapon. For a trial court to enter a deadly weapon finding in the judgment, the trier of fact must first make an affirmative finding to that effect. *See Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016). Courts do not look to the facts of the case to "imply" an affirmative deadly weapon finding but look to the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of an entry of a deadly weapon finding by the jury. *Id.* There are three formal ways a jury makes this affirmative finding: (1) the indictment specifically alleged a "deadly weapon" was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the

indictment"; (2) the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon per se (such as a firearm); or (3) the jury made an express finding of fact of use of a deadly weapon in response to submission of a special issue during the punishment stage of the trial. *Id.*; *see also Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985) (en banc). According to Broadus, this Court should delete the affirmative finding of a deadly weapon because none of these measures were followed. *See id.*

Here, the indictment charging Broadus with aggravated assault alleged that Broadus caused serious bodily injury to Pauline "by shooting [Joseph] while [Joseph] was operating a motor vehicle which [led] to [Joseph] crashing said vehicle into the vehicle operated by [Pauline.]" The jury was instructed to find Broadus guilty of aggravated assault "as charged in the indictment[]" if it believed beyond a reasonable doubt that Broadus "intentionally or knowingly or recklessly cause[d] serious bodily injury to [Pauline] . . . by shooting [Joseph] while [Joseph] was operating a motor vehicle which [led] to [Joseph] crashing said vehicle into the vehicle operated by [Pauline]."

The statutory definition of "deadly weapon" includes "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or . . . anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17). As

18

such, an allegation that a defendant committed an aggravated assault by causing serious bodily injury or death necessarily implies the use of a deadly weapon. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009); *Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008); *Vallado v. State*, 350 S.W.3d 257, 260 (Tex. App.—San Antonio 2011, pet. ref'd). Brandy Henley, a forensic scientist for the Jefferson County Regional Crime Lab who specifically works on firearms, testified that the weapon recovered in this case was a functioning firearm. Having found Broadus guilty of aggravated assault, the jury necessarily found the commission of the assault involved the use or exhibition of a deadly weapon. *See Walker v. State*, No. 05-13-01082-CR, 2014 Tex. App. LEXIS 11869, at \*\*6-7 (Tex. App.—Dallas Oct. 29, 2014, no pet.) (mem. op., not designated for publication) (citing *Crumpton*, 301 S.W.3d at 664); *see also Blount*, 257 S.W.3d at 714 (explaining that both means of committing aggravated assault involve the use of a deadly weapon). Accordingly, the trial court did not err in making the affirmative deadly weapon finding. *See Walker*, 2014 Tex. App. LEXIS 11869, at \*\*6-7. We overrule issue three.

19

Having overruled all of Broadus's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 21, 2020
Opinion Delivered April 14, 2021
Do Not Publish

Before Kreger, Horton and Johnson, JJ.